**Anthony NORRIS, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 71A03–0010–CR–356.**

Court of Appeals of Indiana.

July 30, 2001.

Transfer denied Oct. 17, 2001.

Edward C. Hilgendorf, South Bend, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nandita G. Shepherd, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Anthony Norris appeals his convictions for two counts of intimidation, one as a class C felony, and one as a class D felony. He raises one issue on appeal: Whether there is sufficient evidence to support the two convictions.

We affirm.

### Facts and Procedural History

The facts most favorable to the verdict reveal that Norris has two children with his girlfriend, Michelle Dinger. Michelle and the children temporarily moved in with Michelle's brother, Eric Dinger, following a break in her relationship with Norris. In the early evening of November 22, 1999, during a telephone conversation with Norris, Michelle became upset and began crying. Shortly thereafter, the police were called because Eric understood that Norris had made threats to Michelle during the telephone call. When South Bend Police Officer Ciesiolka and his partner arrived at the house, they advised Eric not to allow Norris to take the children that evening, but rather to wait until the next morning after everyone had had an opportunity to calm down.

Norris arrived at the house shortly after the police left. Eric met Norris outside the house and told him what the police had suggested. Norris told Eric to "stay the hell" out of his life. R. at 117. When Eric attempted to walk back to the house, Norris reached in his car and pulled out a revolver. Norris told Eric that he would kill him and would not think twice about it, because he thought Eric needed to stay out of his family's business. At that time,

Eric's brother-in-law, Jason Wolf, came out of the house and Norris threw the gun back into his car.

Officer Ciesiolka and his partner responded to the second call of the evening from the Dinger house for police assistance. As Ciesiolka was approaching the house, he saw Norris and Eric arguing in the front yard, then he saw Norris walk over to a car, reach into it, then walk back over to the two men in the front yard. Upon questioning Norris, Ciesiolka learned that Norris had a loaded handgun on the front seat of his car. Ciesiolka verified Norris's gun permit, unloaded the handgun before returning it and the five live rounds of ammunition to Norris and told Norris to be on his way. Norris left.

Subsequent to Norris's departure, Ciesiolka learned of the threatening gesture Norris made with his handgun to Eric. Eric was very reluctant to divulge this information, and did so only at the insistence of his wife, Angelina. The officer testified that he "really wanted to get a taped statement from the Dingers about this entire incident," but they "[f]lat refused." R. at 157–58. The officer further testified that the reason for the Dingers' refusal was that "[t]hey were afraid." R. at 158. He described Eric as "sitting there nervously smoking a cigarette, one drag after another," and looking "drained." R. at 155.

The police officers advised the Dingers that they should go stay with some friends or relatives for the night and assisted the Dingers' move before returning to the police station to complete their report. Eric recollected that Michelle went to a women's shelter, his wife Angelina and their daughter stayed with Angelina's mother, and his brother-in-law Jason stayed nearby with Eric's close friend.

Later that evening, Eric went back to his mother-in-law's house to make sure his wife was all right. As Eric was walking along the street, Norris saw him, pulled his car over, exited, and began arguing with Eric. Norris told Eric that they should get this over with because sooner or later he was going to get Eric. The police responded for a third time that evening to this confrontation and Norris was taken into custody and charged with two counts of intimidation, one as a class D felony and one as a class C felony, as well as one count of pointing a firearm. Following a trial by jury, Norris was found guilty on the two counts of intimidation and not guilty of pointing a firearm.

Norris appeals.

### Discussion and Decision

Norris contends that the evidence is insufficient to support his convictions for the two counts of intimidation. We disagree.

When reviewing a claim for sufficiency of the evidence, we consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn therefrom. *Davis v. State,* 658 N.E.2d 896, 897 (Ind.1995). We do not reweigh the evidence or assess witness credibility. *Id.* The conviction will be affirmed unless we conclude that no reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

In order to support a conviction for intimidation as a class C felony, the State had to prove that: (1) Norris communicated a threat to Eric, (2) with the intent that Eric engage in conduct against Eric's will, which in this case involved allowing Norris to take Norris's children from their mother, Michelle, and (3) during the incident Norris drew a gun. Ind.Code § 35–45–2–1(b)(2) (1998).

The testimony of the State's witnesses supports the elements of the class C felony that Norris arrived at the Dinger residence and communicated threats to Eric, when Eric told Norris that he would have to wait until the following morning to take his children. Angelina testified that Norris continued to demand his children after he had drawn his handgun. Eric testified further that he agreed with the police that Norris should wait until the following morning to take his children. We find that there is sufficient evidence to support the jury's verdict against Norris for the C felony intimidation conviction.

In order to support a conviction for intimidation as a class D felony, the State had to prove that: (1) Norris communicated a threat to Eric, (2) with the intent that Eric be placed in fear of retaliation for a prior lawful act, which in this case involved Eric's prevention of Norris from taking Norris's children until the next morning, and (3) that the threat was to commit a forcible felony. *Id.* A "forcible felony" means a felony that involves the use or threat of force against a person, or in which there is imminent danger of bodily injury to a person. *Id.*

The testimony indicates that, having assisted his family relocate for the evening following the incident with Norris at their residence, Eric decided to walk back down the street to his mother-in-law's house to check on his wife. Norris, who was driving down the street, saw Eric, pulled his car up near him, jumped out and began yelling at him once again. Eric testified that Norris told him that they should just "get this over with," because sooner or later he was "going to get" Eric. R. at 121. Eric testified that he feared for his life. When Officer John Hoffman arrived on the scene, he witnessed Norris arguing with Eric, who was facing Norris with his hands raised. Officer Hoffman recovered Norris's handgun from the front

seat of Norris's car. The handgun had been reloaded with the five rounds of live ammunition. We find that the record contains sufficient evidence to support Norris's conviction for intimidation as a class D felony. To find otherwise would be to invade the province of the jury to weigh the evidence and judge the credibility of the witnesses.

Importantly, the record is devoid of any evidence that Norris was *entitled* to the visitation with his children he was demanding on the evening in question. At no time did Norris suggest or offer evidence that his attempt to take the children from the Dinger residence was an exercise of court-ordered visitation. In fact, during the trial, Norris did not object to or otherwise rebut Angelina's recitation of what she believed to be the custodial arrangements between Michelle and Norris. Angelina testified that Michelle had "full custody of the children" and that Norris "only had proper visitation." R. at 138. Norris's own testimony seems to confirm Angelina's understanding of the formal custodial arrangements regarding the children. Norris's version, somewhat self-serving, was that, "[I]f Michelle felt that she didn't want me to pick the kids up, I would have never went there after I got off work." R. at 189.

The testimony also reflects that, subsequent to one or more telephone conversations with Norris, Michelle was "crying and really, really scared." R. at 110. The telephone conversation between Norris and Michelle was so intensely threatening that the Dingers called 9–1–1 to report the incident to the police. As a result, Officer Ciesiolka was dispatched to the Dinger residence to investigate "harassing phone calls." R. at 148. Eric's unchallenged testimony was that, due to the violent nature of the conversation, the police officers told him "not to let [Norris] take his chil-

dren, tell him to wait until tomorrow, to go home, to cool off, come first thing in the morning," or that Eric could take the children to him. R. at 115.

It is also instructive that the responding police officers decided to prepare the paperwork from their initial run to the Dinger residence in a nearby parking lot because they had "sort of a feeling" that they might be called back. R. at 150. In the midst of that paperwork, they were again dispatched to the Dingers' on a report that Norris had arrived. After verifying that Norris had a permit to carry the fully-loaded handgun that was lying on the front seat of his car, the police officers unloaded the weapon, returned the handgun and the ammunition to Norris, and told him to be on his way. Shortly thereafter, when they were dispatched for yet a third time that evening due to Norris's choice to confront Eric on the street, the officers found Norris's handgun reloaded.

The concurrence opines, "A different outcome would have obtained had Eric acted unilaterally...." 755 N.E.2d at 194. We agree and do not suggest that anyone other than a court is vested with the authority to determine child custody and visitation matters. However, in light of the statutory duty of municipal police officers "to suppress all breaches of the peace within their knowledge," Ind.Code § 36–8–3–6(c)(4)(1998), and in the absence of any evidence that Norris was *entitled* to take the children as demanded, it was entirely proper for the responding police officers to attempt to diffuse the volatile situation they were presented with by sending everyone "back to his corner" to cool down. It was also entirely reasonable and proper for Eric Dinger to follow the instructions of the responding police officers during what was clearly a life-threatening crisis. To hold otherwise would be inconsistent with the totality of the circumstances and

would serve as implicit license for unnecessary, assaultive behavior in common visitation contacts between parents and other relatives of children who are the subject of visitation disputes.

Affirmed.

BAILEY, J., concurs.

BAKER, J., concurs with opinion.

BAKER, Judge, concurring with separate opinion.

I concur fully with the majority's opinion but write separately in light of the unique circumstances presented here. Inasmuch as the police are vested with the duty " 'to suppress all breaches of the peace within their knowledge,' " they reasonably instructed Eric to refuse Norris visitation with the children until tempers calmed. Op. at 193 (quoting Ind.Code § 36–8–3–6(c)(4)). Following those police instructions, Eric acted lawfully in refusing Norris visitation. A different outcome would have obtained had Eric acted unilaterally—that is, without police instruction or judicial authorization. Our General Assembly has committed *ultimate* authority over child custody and visitation matters to Indiana courts, not private citizens or law enforcement personnel. *See, e.g.,* Ind. Code § 31–17–2–8 ("The court shall determine custody and enter a custody order in accordance with the best interests of the child."); Ind.Code § 31–17–2–18 (granting court authority "to exercise continuing supervision over the case to assure that the custodial or visitation terms of the decree are carried out"); Ind.Code § 31–17–2–21 (granting court authority to modify custody). In the future, the courts' use and statewide articulation of the *Indiana Parenting Time Guidelines,* together with consistent "parenting time," might help de-fuse volatile custody situations such as this one.