Marlow J. **LAINHART**, Appellant–
Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 24A01–0904–CR–184.

Court of Appeals of Indiana.

Nov. 23, 2009.

Stacy R. Uliana, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Marlow Lainhart appeals his conviction for Class A misdemeanor intimidation. Marlow was found guilty of communicating a threat to another person with intent to place the victim in fear of retaliation for a prior lawful act. At trial, the State improperly (1) distinguished the roles of defense and prosecution in criminal cases, (2) discussed the penal consequences of the crime charged, (3) commented on the defendant's failure to produce witnesses in his defense, and (4) vouched for the credibility of the investigating officer. We find these acts of misconduct together constituted fundamental error. We further hold that the State improperly charged alternate crimes in a single count of intimidation. We reverse and remand.

### Facts and Procedural History

Marlow was twenty-three years old and lived with his grandparents just outside of Laurel, Indiana. His father Kenny lived next door. Marlow used to be good friends with Derek Durham, but for reasons unknown, Marlow and Derek had become bitter archenemies. Marlow also knew three girls from Laurel named Jamie, Ruthy, and Amy. Jamie, Ruthy, and Amy were all friends with Derek.

One evening in October 2007, Jamie was driving Ruthy and Amy around downtown Laurel. Downtown Laurel is laid out roughly as follows:

This schematic is based on State's Exhibit 2, a hand-drawn map prepared by Deputy Sheriff John Roberts. It is not to scale.

Ruthy was in the passenger seat of Jamie's car. Amy was sitting in back. Jamie was nine months pregnant, and Amy had undergone gallbladder surgery that day. The girls were heading east toward the Whitewater Bridge when they spotted Derek standing outside the Long Branch Tavern. Jamie stopped the car so they could talk to him. Derek walked up to the passenger-side window but did not enter the vehicle.

Meanwhile Marlow was driving nearby with Amy's brother Josh. Marlow approached from around the corner and saw Jamie, Ruthy, and Amy talking with Derek. Marlow began calling Derek names and then challenged him to a fight. Derek ran behind the Long Branch Tavern. Jamie, Ruthy, and Amy sped off heading south on Dam Road.

The girls proceeded to a dead-end before turning around and driving back toward downtown Laurel. When they reached the north end of Dam Road, they saw Marlow, Josh, and two other associates standing to the right with baseball bats. The girls then heard a loud engine and saw a truck to their left flashing its lights. Marlow's father Kenny was behind the wheel. Jamie turned left to cross the Whitewater Bridge. Kenny rear-ended Jamie's car with his truck and moved forward to pin her car against the bridge guardrail. Kenny then got out of the truck and hit the back of Jamie's car with a baseball bat. Jamie found just enough space between Kenny's truck and the guardrail to accelerate forward and escape.

At this point Amy was scared and upset, so Jamie dropped her off at the Laurel Apartments where Ruthy lived. Amy got out of the car and went inside the apartments. As Jamie and Ruthy were driving out of the complex, Kenny's truck pulled up on their left side. Marlow's car pulled up on the right. Marlow then got out and hit Jamie's car with a bat. He told Ruthy, "[G]et your fat ass out of the car, I'm gonna beat you down." Tr. p. 90. Kenny pointed a shotgun at Jamie and said, "I'll kill the bitch I swear to God, I will kill the bitch." Id. Jamie and Ruthy drove off to find the police.

Witness Tara Wiggens was also exiting the apartment complex at this time. Tara was a longtime Laurel resident and an acquaintance of those involved in these altercations. Kenny stopped Tara and asked her if she had seen Derek. Tara told Kenny that she had seen Derek standing near the apartment dumpsters. Kenny said that Derek had either threatened or hit Marlow.

Marlow and Kenny proceeded inside the complex and tried to force their way into Ruthy's apartment. Ruthy's mom stood at the door pushing them out. Kenny told Ruthy's mom, "[Y]ou know what I'm capable of and your daughter's getting it." *Id.* at 121. Kenny said to Amy, "[L]ittle boy if you know what's good for ya you'll stay away from Ruthy." *Id.* Marlow then informed Kenny, "[T]hat's not a boy that's Josh's little sister...." *Id.*

Jamie and Ruthy ultimately found Deputy Sheriff John Roberts and told him what had transpired. Officer Roberts brought them to the police station where they filled out a report and completed written statements. At some point Marlow drove by the station and began yelling profanities outside. Officer Roberts told Marlow to stop, after which Marlow fled. Officer Roberts and Officer Leonard Baker pursued Marlow in their patrol cars. The officers were "closing the gap," *id.* at 140, when they spotted Kenny driving his truck. Marlow continued to drive away, but Kenny pulled over acknowledging the lights and sirens. The officers stopped to detain Kenny and found an aluminum bat in the back of his vehicle.

The State charged Marlow on October 31, 2007 with Class A misdemeanor intimidation. The charging information alleged that

> Marlow J. Lainhart on or about October 18, 2007, at said County of Franklin and State of Indiana, did then and there unlawfully, knowingly or intentionally, communicate a threat to another person, to-wit: Ruth Schreier, Jamie Baker and/or Amy Robertson, with the intent that the other person be placed in fear of retaliation for a prior lawful act.

Appellant's App. p. 9. Marlow was arrested on November 11, 2007, *see id.* at 1, and brought to trial in February 2009.

At trial the State called Jamie, Ruthy, Amy, Tara, and Officer Roberts to testify to the foregoing events. Defense counsel cross-examined Jamie and Ruthy about their written statements to police, which evidently omitted certain facts to which the girls testified at trial. Jamie's statement did not mention that Amy had been in the car, that the car had been hit with a baseball bat, or even that the car had been rammed. Ruthy's statement likewise did not discuss the collision or mention that Jamie's car had been struck with a bat.

Marlow testified in his own defense. Marlow claimed that on the night in question, he was helping his friend Josh move out of his trailer. At some point Marlow was driving across the Whitewater Bridge when his car battery die d. Shortly thereafter he saw a white car pass by and turn onto Dam Road. Inside the car were Ruthy, Derek and three or four more individuals. Marlow phoned Kenny and told him he was having car trouble. Kenny drove to the bridge with a replacement battery. About fifteen minutes later the white car returned. Marlow testified that "[a]s they're coming by, the back rider window starts to roll down bout half way, my dad hits his headlights and goes in between my car and her car while I'm changing batteries. And they take off and he takes off behind them...." Tr. p. 171–72. Marlow allegedly drove straight to his grandmother's house once his car was running again. Marlow further testified that he was not involved in an altercation at the Laurel Apartments and that in fact he was never at the apartment complex that night.

The defense also called two witnesses named Anna Lane and Luther Stanton. Anna and Luther testified that they had seen Ruthy at a get-together in October 2008 and that Ruthy had been talking about an incident on Laurel–Dam Road. Anna testified that Ruthy "was bragging

about how she was getting off of some trouble that she was in, making a, she made a statement of how she had a pistol and some Derek Durham dude had a shotgun and was on Laurel–Dam Road causing trouble with some Kenny guy, at the time." *Id.* at 186. According to Luther, Ruthy was "talking about how she's gonna get out of charges fer [sic] gun possession and throw the charges onto somebody else. . . ." *Id.* at 196. "[S]he said that she and Derek had been driving down Laurel–Dam Road and that she was gonna sh-sh-, she had a, she had a pistol and that Derek had a shotgun and they were gonna try and go after Kenny, that's-that's where it all started, is what they were talking about in the trailer." *Id.* at 197.

In addition, the defense proffered the testimony of Marlow's former girlfriend Candice Kolb. Candice had received a threatening text message from Ruthy in January 2009. Marlow sought to introduce the text message and Candice's accompanying testimony in order to show Ruthy's bias against Marlow and to attack her credibility. The trial court excluded the text message as irrelevant and potentially confusing to the jury.

The State argued alternate theories at trial: either that Marlow was guilty by reason of his own physical and verbal threats to the girls or that he was culpable for aiding and inducing Kenny's threats. The trial court instructed the jury that "[t]o return a verdict, each of you must agree to it," *id.* at 231, but the court did not provide a more specific jury unanimity instruction in light of the multiple theories argued. The jury found Marlow "guilty of Intimidation, a Class A misdemeanor." Appellant's App. p. 73; Tr. p. 235. Marlow now appeals.

**Discussion and Decision**

Marlow raises four issues which we restate and reorder as follows: (1) whether the State committed several acts of prosecutorial misconduct at trial together constituting fundamental error, (2) whether the State presented sufficient evidence to support the guilty verdict, (3) whether the trial court erred by permitting the State to charge and argue alternative victims in a single count of intimidation, and (4) whether the trial court erred by excluding evidence of a complaining witness's bias.

## I. Prosecutorial Misconduct

### A. Standard of Review

■■■ Marlow argues that the State committed several acts of prosecutorial misconduct beginning at jury selection and continuing through closing argument. Trial counsel did not object to any of the alleged instances of misconduct. Generally, in order to properly preserve a claim of prosecutorial misconduct for appeal, a defendant must not only raise a contemporaneous objection, he must also request an admonishment and, if the admonishment is not given or is insufficient to cure the error, then he must request a mistrial. *Washington v. State,* 902 N.E.2d 280, 289–90 (Ind.Ct.App.2009). Where a defendant fails to make an objection to the allegedly improper comments, he fails to preserve any claim of prosecutorial misconduct for appellate review. *Id.* at 290. However, waiver notwithstanding, a defendant may still bring a claim for prosecutorial misconduct on appeal if he asserts fundamental error. *Id.*

■■■ In order for prosecutorial misconduct to constitute fundamental error, the misconduct must constitute a clearly blatant violation of basic and elementary principles of due process, present an undeniable and substantial potential for harm, and make a fair trial impossible. *Id.* Additionally, the alleged misconduct must have subjected the defendant to grave peril and had a probable persuasive effect on the

jury's decision. *Id.* The gravity of the peril turns on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct. *Id.* In judging the propriety of a prosecutor's remarks, the court considers the statements in the context of the argument as a whole. *Id.*

### B. Alleged Misconduct

#### 1. Distinction Between Roles of Prosecution and Defense

■ During jury selection, the following colloquy took place between the State and two prospective jurors:

PROSECUTOR: [The deputy prosecutor] and I take oaths that-that our job is to seek the truth. Our job is not to-to, you've got to get a guilty verdict at all costs. That's not our job. Our job is to seek the truth. We take an oath to do that and that's why we have to held to that standard. We can't play games in the-in the Courtroom. We just, we, the facts are brought to us. We present facts. Would you agree with that, Mr. Defense Attorney? Very good, Mr. Gottlieb. I'm not saying anything critical. I say it about all defense attorneys. That's not their job. They don't take an oath to seek the truth. Their job, and they have one, is to defend their client to the best of their ability, whatever that may be. Would you agree to that Mr. Kreiger?

JUROR: Yes.

PROSECUTOR: So you-, you know our jobs are different. Mr. Roberts, do you understand that?

JUROR: Sure.

Tr. p. 28–29. Marlow argues that the prosecutor committed misconduct by exalting his own responsibility as truth-seeker while degrading the role of defense counsel.

■ Differentiating the roles of prosecution and defense during *voir dire* is generally improper and may constitute fundamental error. *See Bardonner v. State,* 587 N.E.2d 1353, 1361 (Ind.Ct.App.1992), *trans. denied.* In *Bardonner,* the prosecutor asked a prospective juror during *voir dire* whether both the prosecution and defense had an obligation to seek the truth. *Id.* at 1355. The juror answered in the affirmative. *Id.* The prosecutor responded by asking, "Does everybody feel that way? Both sides in this courtroom have an obligation to seek the truth. How many people would be surprised if I told you that wasn't the law?" *Id.* The prosecutor then read a series of excerpts from Justice White's separate opinion in *United States v. Wade,* 388 U.S. 218, 256–58, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). *Id.* Those excerpts included: "Law enforcement officers have the obligation to convict the guilty and make sure they do not convict the innocent."; "They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of a crime."; "[The State's obligation in a criminal prosecution] is not that it shall win a case but that justice shall be done."; "[The prosecutor] may prosecute with earnestness and vigor-indeed, he should do so. But while he may strike hard blows he's not a[t] liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."; "Defense counsel need present nothing even if he knows what the truth is."; "[Defense counsel] need not furnish any witnesses to the police or reveal any confidences of his client, or furnish any other information to help the prosecution's case. If he can confuse a witness, even a truthful one, or make him

appear at a disadvantage, unsure or indecisive, that will be his normal course."; "Undoubtedly, there are some limits which defense counsel must observe but more often than not, defense counsel will cross-examine a prosecution witness, and impeach him if he can, even if he thinks the witness is telling the truth. . . ."; "In this respect, as part of our modified adversary system and as part of the duty imposed on the most honorable defense counsel, we countenance or require conduct which in many instances has little, if any, relation to the search for the truth." *Id.* at 1355–56 (quoting *Wade,* 388 U.S. at 256–58, 87 S.Ct. 1926 (White, J., dissenting in part and concurring in part)). On appeal this Court reversed the defendant's conviction, holding that the prosecutor's conduct constituted fundamental error. *Id.* at 1362. We noted that the purpose of *voir dire* is to ascertain whether prospective jurors can render a fair and impartial verdict in accordance with the law and evidence. *Id.* at 1359. "[I]f jurors are tainted by the viewpoint that only the prosecutor is presenting the truth and the defense counsel's role is to obstruct the search for truth, they may evaluate every bit of evidence from this perspective." *Id.* at 1360. We held that the prosecutor's comments disturbed the presumption of innocence, disparaged the right to confrontation, and impinged on the right to effective counsel. *Id.* We further explained:

> The only purpose for the prosecutor's comments on the respective roles of defense and prosecution is to prejudice the jurors into viewing the prosecutor as a "good guy" and the defense counsel as a "bad guy." We think this is an unfair tactic which not only negates the defendant's presumption of innocence, but also runs afoul of Ind. Prof. Conduct Rule 3.4, which requires fairness to opposing party and counsel, and prohibits an attorney from alluding to matters

that the lawyer does not reasonably believe are relevant or will not be supported by the facts in issue. Here, the issue before the jury was whether the evidence was sufficient to convict the defendant of the crimes beyond a reasonable doubt. It is not the jurors' responsibility to make a finding as to the role of the prosecutor and defense counsel or to determine the character of the defense counsel. This information is certainly not relevant to the case.

*Id.* at 1361.

Here the prosecutor's comments during *voir dire* echoed the remarks held improper in *Bardonner.* The prosecutor explained that his job was "to seek the truth," whereas the role of defense counsel was "to defend their client to the best of their ability, whatever that may be." In accordance with *Bardonner,* we hold that the State's *voir dire* remarks constituted improper commentary on the disparate roles of defense and prosecution. We acknowledge that the prosecutor's comments in this case were not as protracted as those addressed in *Bardonner,* and for that reason they alone may not have constituted fundamental error. *See, e.g., Miller v. State,* 623 N.E.2d 403, 408 (Ind.1993) ("In the case at bar, . . . the prosecutor's remarks were not as extended and not as pointed as those in *Bardonner.*"). In any event, we have analyzed the cumulative effect of the State's misconduct below, and we therefore decline to assess the gravity of the error within this section.

### 2. Reference to Penal Consequences

■ The prosecutor also discussed his burden of proof during jury selection. At one point a prospective juror stated that he would have to be pretty sure the defendant was guilty in order to vote for conviction. The juror said that "with somebody's you know, livelihood or when a life

is in- jeopardy, you know you better be really sure." Tr. p. 15. The prosecutor responded as follows:

I understand. And-, uh, you-you bring up something i-i-interesting that I was going to get to later, Mr. Bohman, that-that, uh, i-it's more human. We think about a lot of things when we make a decision and it is an important decision. I would agree with that. And you bring up about somebody's livelihood at stake. You will be instructed again, one of the laws, one of the many instructions you'll get, is that when you deliberate, if you're selected, you cannot take into account what may happen to the Defendant. That's solely the providence of the Judge. If-if you would return a guilty verdict. You have no say in it. You would just say either the State proved its case or they didn't. And that may not seem fair, and the reason I say that, this is an A Misdemeanor. The Judge has a wide latitude he can give him. Nothing. He can slap him on the hand and-and, uh, give him no fine. No-no time. He can put him on probation. He can do any of that or he can give him some time with a ceiling that's not that high because it's a Misdemeanor. And that's why you won't even know all that.

Don't think because it's solely up to the Judge and he-, if-if there were a return of a guilty verdict, you wouldn't even be present. The Judge would hold a Sentencing Hearing. And both sides would say what they think he should have and they'd argue what's we call mitigating, aggravating, all that. So it's a good point you bring up but-but that, still that doesn't lessen our burden I agree with you. . . .

*Id.* Marlow argues that the State improperly discussed potential punishment with the jury panel.

█ Punishment is not an element of the crime charged, and when punishment is not to be imposed by the jury, it is not a matter to be placed before the jury, by the State, for its consideration. *Wilson v. State,* 169 Ind.App. 33, 34, 346 N.E.2d 279, 281 (1976), *reh'g denied.* Our Supreme Court has explained that

[a] jury must determine beyond a reasonable doubt, from the evidence presented, whether an accused did those specific acts which constituted the crime with which he was charged. In performing this Guilt assessing task, the jury must be oblivious to the legislature's punishment scheme. To hold otherwise, we would be condoning verdicts in which the jury might compromise, to the defendant's benefit or detriment, in order to reach a certain number of years of imprisonment.

*Debose v. State,* 270 Ind. 675, 676, 389 N.E.2d 272, 273–74 (1979); *accord Coy v. State,* 720 N.E.2d 370, 374 (Ind.1999).

Here the prosecutor told jurors that the trial court judge "has a wide latitude he can give him. Nothing. He can slap him on the hand and-and, uh, give him no fine. No-no time. He can put him on probation. He can do any of that or he can give him some time with a ceiling that's not that high because it's a Misdemeanor." We conclude that under *Wilson, Debose,* and *Coy,* the prosecutor's allusion to Marlow's potential sentence was inappropriate. The prosecutor did not cite the exact range of punishment for the crime charged, but even the State concedes that "what the prosecutor did here had essentially the same consequences as if the prosecutor had informed the jury of the actual penalties; that is, it presented the problem of the jury considering something other than guilt or innocence on the evidence in its deliberations and such may constitute misconduct." Appellee's Br. p. 21. We agree

with both Marlow and the State that the prosecutor's comments vis-a-vis potential punishment were improper.

### 3. Impeachment with Post–Arrest Silence

■ The State asked the following questions when cross-examining Marlow:

Q: And, after these charges were filed against you ...

A: Yes sir.

Q: Did you go to Officer Roberts and say hey this is what happened? I wasn't there?

A: No sir. I——

Q: Why didn't you do that?

A: I feel John Roberts has something against me, sir.

Q: (inaudible)

A: (inaudible) personally, I don't know. I feel that——

Q: Could you go to another law enforcement officer or they all ——

A:——I–I don't——

Q: ——got something against you?

A: know nothing about it. What should I have had done? I have——

Q: Well you're charged with a crime, don't you want to go in and say hey this is a big mistake, here's the story?

A: Yes sir. I went in. I went in and I, I had, my dad had told me this after he had bonded out of jail because I, I was not even arrested that night.

Q: But——

A: So.

Q:——you never went in to give them-to give a statement, did you? Tell your side?

A: They never asked me for a statement.

Q: But you didn't come forward, did you?

A: As in how? To tell them about what had happened? No sir.

Q: Mr. Lainhart, do you want this Jury to believe everything you're saying, don't you?

Tr. p. 179–80. Marlow argues that the State improperly impeached him with his post-arrest silence.

■ The use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, violates the Due Process Clause of the Fourteenth Amendment. *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). "[W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618, 96 S.Ct. 2240. However, the Due Process Clause does not prohibit impeachment using a defendant's pre-arrest silence, *Jenkins v. Anderson,* 447 U.S. 231, 240, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), or his postarrest, *pre-Miranda* silence, *Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). *See also Brecht v. Abrahamson,* 507 U.S. 619, 628–29, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (illustrating these rules). The rationale is that *Doyle* protections do not attach "[i]n the absence of the sort of affirmative assurances embodied in the *Miranda* warnings." *Fletcher,* 455 U.S. at 606–07, 102 S.Ct. 1309. States may enforce more restrictive evidentiary rules which prohibit use of pre-*Miranda* silence for impeachment purposes. *Jenkins,* 447 U.S. at 240, 100 S.Ct. 2124; *Fletcher,* 455 U.S. at 607, 102 S.Ct. 1309. But Indiana has apparently declined to do so and remains aligned

with the federal constitutional standards. *See, e.g., Teague v. State*, 891 N.E.2d 1121, 1125–26 (Ind.Ct.App.2008). Where a defendant asserts a *Doyle* violation, he "ordinarily bears the burden of showing that *Miranda* warnings were given prior to the post-arrest silence used by the state for impeachment purposes." 3 Wayne R. LaFave, *Criminal Procedure* § 9.6(a) n. 47 (3d ed.2007); *see also Fletcher*, 455 U.S. at 605, 102 S.Ct. 1309 (finding no *Doyle* violation, where the record did not indicate that the defendant received any *Miranda* warnings during the period in which he remained silent immediately after his arrest).

Marlow was charged in this case on October 31, 2007. He was not arrested until November 11. On cross-examination the State asked Marlow why he failed to come forward with his side of the story "after these charges were filed against [him]." We understand the State's questions as referring to the time immediately after Marlow was charged and thus before he was arrested. Under *Jenkins*, the State was not prohibited from impeaching Marlow with his pre-arrest silence. Even if we construe the State's questions as covering the time after Marlow was arrested, we have no indication at what point Marlow was Mirandized for purposes of a *Doyle/Fletcher* analysis. Marlow therefore fails to meet his burden of showing that he received *Miranda* warnings prior to the silence with which he was impeached. Accordingly, we find no *Doyle* violation and hold that the State's cross-examination was not improper.

### 4. Commentary on Failure to Call Defense Witnesses

■■ The State also cross-examined Marlow as follows:

Q: And, I assume that Josh Robertson is going to come in today and verify everything you've said?

A: I don't know where Josh Robertson is.

Q: Okay. Well, I assume your father's gonna come in and verify everything you said.

A: If my attorney feels that he needs to, I don't feel he needs to, so.

Q: Okay. Fair enough. That's all I have.

A: But if he come in here, yes sir. He can verify.

COURT: Mr. Gottlieb? Anything else?

DEFENSE ATTORNEY: No further—

PROSECUTOR: What about your Grandmother? Is she going to come in and verify what you were there with her all night?

A: No sir. Her and my grandfather's heart cannot withstand something like this.

Tr. 184–85. The State proceeded to argue in closing, "Where's Josh Robertson? I don't know. Where's Kenny Lainhart? Where's his grandparents? (inaudible) to support anything he said?" *Id.* at 219. Marlow argues that the State improperly referred to his failure to call additional witnesses in his favor.

■■■ It is improper for a prosecutor to suggest that a defendant shoulders the burden of proof in a criminal case. *Dobbins v. State*, 721 N.E.2d 867, 874 (Ind. 1999). While the State may argue to the jury the uncontradicted nature of its own case, the State may not suggest that the defendant has the burden of proof by inquiring in closing argument why the defendant did not call witnesses to testify on his behalf. *Wright v. State*, 690 N.E.2d 1098, 1112 (Ind.1997), *reh'g denied.*

Here the prosecutor elicited during both cross-examination and closing argument that Marlow did not call Josh, Kenny, or his grandparents to corroborate his story

and alibi. The State concedes that "the prosecutor's actions here may have constituted misconduct." Appellee's Br. p. 26. We agree and conclude that the prosecutor's remarks were improper.

The State points out, however, that the trial court instructed the jury both at the beginning and conclusion of trial that the State bore the burden of proof beyond a reasonable doubt, that a person charged with a crime is presumed innocent, and that the defendant "is not required to present any evidence to prove his innocence or to prove or explain anything." Tr. p. 60, 230. Indiana cases have consistently held that a prosecutor's improper statements concerning a defendant's failure to present witnesses may be cured by the trial court advising the jury that the defendant was not required to prove his innocence or to present any evidence. *Stephenson v. State,* 742 N.E.2d 463, 483 (Ind. 2001); *Chubb v. State,* 640 N.E.2d 44, 48–49 (Ind.1994); *Pettiford v. State,* 506 N.E.2d 1088, 1089–90 (Ind.1987). We therefore remain cognizant of the trial court's admonishments when conducting our final cumulative error analysis.

### 5. *Improper Vouching*

The prosecutor made several comments during jury selection and closing argument pertaining to police officer credibility. At one point during *voir dire* the prosecutor asked, "[W]e certainly don't have any place in our society for an officer to come in and be less than truthful do we?" Tr. p. 27. Later he posed the following questions to the jury pool:

PROSECUTOR: So that, they'd be putting their badge at risk if they ever did that (inaudible). That they lied under oath, they're they're [sic] done. There's no place for it, correct?

JUROR: Right.

PROSECUTOR: Do you think it does happen? People come in here and lie?

JUROR: I think——

PROSECUTOR: I'm not saying police officers——

JUROR: Right.

PROSECUTOR:——but I'm just saying. JUROR: I think it probably does happen. Everybody's human and they make mistakes.

PROSECUTOR: Unfortunately I think you're probably right, unfortun-(sic). Ms. Tompkins, you ... ?

JUROR: I'm sure there's times that people lie, yes.

PROSECUTOR: Okay. And do you understand that it would take an awful lot to get an officer up there didn't ya? (sic) I mean ...

JUROR: To lie?

PROSECUTOR: Yeah.

JUROR: Oh, yeah.

PROSECUTOR: That, I mean there's no place for it in our society.

JUROR: No.

PROSECUTOR: They're here to protect and serve. I think they take an oath that's-that's why they do their job. That's why they get involved. Mr. Lamping, you agree or disagree?

JUROR: I agree. They should be straight forward and (inaudible) say what they see.

*Id.* at 46–47. The State also argued in closing:

Do you think any officer, on a class A Misdemeanor that are usually tried to the Judge, if he has a right to a Jury Trial, would come in here for any reason? I don't care if it's murder that, there's ... I'm offended that they would even think that of an officer in this county. These officers are here to protect and serve and if any of them ever did anything like that, I've been Prosecutor as (inaudible) would tell you, lots

of years, and if any officer would even come close to not putting out exactly what happened telling the truth, they're out. I would never, ever, put them in front of a Jury, if I suspected anything. *Id.* at 220–21. Marlow contends that the prosecutor preconditioned the jury to believe police officers and personally vouched for Officer Roberts's credibility in closing argument.

 "The function of voir dire examination is not to educate jurors, but to ascertain whether jurors can render a fair and impartial verdict in accordance with the law and the evidence." *Coy,* 720 N.E.2d at 372. *Voir dire* should not be used to begin trying the case before evidence has been presented. *Steelman v. State,* 602 N.E.2d 152, 158 (Ind.Ct.App. 1992). It is furthermore inappropriate for the prosecutor to make an argument which takes the form of personally vouching for a witness. *Schlomer v. State,* 580 N.E.2d 950, 957 (Ind.1991) (prosecutor's statement, "I believe Detective McGee when he tell[s] us what happened," held improper). Indiana Professional Conduct Rule 3.4(e) provides:

> A lawyer shall not ... in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of the accused....

A prosecutor may comment on the credibility of the witnesses only if the assertions are based on reasons which arise from the evidence. *Cooper v. State,* 854 N.E.2d 831, 836 (Ind.2006).

Here the prosecutor suggested during jury selection that "it would take an awful lot to get an officer [to lie]" and said that "there's no place for it in our society." During closing argument he told jurors that "if any officer would even come close to not putting out exactly what happened telling the truth, they're out. I would never, ever, put them in front of a Jury, if I suspected anything." We agree with Marlow that the prosecutor's remarks constituted improper indoctrination, vouching, and commentary on the justness of the cause.

## C. Cumulative Error Analysis

 We conclude that the State improperly distinguished the roles of prosecution and defense, referred to the penal consequences of the offense charged, commented on Marlow's failure to call corroborating witnesses, and personally vouched for Officer Roberts's credibility. Although each instance of prosecutorial misconduct alone may not have constituted reversible error, we are persuaded that the cumulative effect of the State's misconduct was to make a fair trial impossible. This case involved conflicting testimony and hinged almost exclusively on the credibility of the witnesses. Jamie, Ruthy, and Amy testified to a series of physical and verbal threats they received from Marlow and Kenny. Tara and Officer Roberts corroborated the girls' story. But Marlow provided a different account about what occurred on Dam Road and denied going to the Laurel Apartments that evening. Anna and Luther's testimony suggested Ruthy was fabricating her explanation of what happened. The defense also pointed out that Jamie and Ruthy discussed material facts at trial that they had not recounted in their police statements. Because this case involved so much competing testimony, and because most of the State's misconduct went straight to the credibility of the witnesses, we cannot say that the State's misconduct was harmless. The

jury may have accepted Marlow's version of events if the State had not improperly distinguished the roles of defense and prosecution, personally vouched for Officer Roberts, and commented on Marlow's failure to call additional witnesses in his favor. We find the State's actions placed Marlow in grave peril and together constituted fundamental error. Furthermore, we do not believe that the trial court's admonishments discussed in subsection B.4, *supra*, were sufficient to cure the totality of the State's misconduct. For these reasons we reverse.

## II. Sufficiency of the Evidence

 Having concluded that the State's misconduct constituted reversible error, the question of whether Marlow may be subjected to a new trial depends upon an analysis of the sufficiency of the evidence. *McMurrar v. State*, 905 N.E.2d 527, 529 (Ind.Ct.App.2009). If, viewed as a whole, the State's evidence would have been sufficient to sustain the judgment, retrial would not offend double jeopardy principles. *Id.* If, however, the evidence is insufficient, Marlow may not be retried. *Id.* at 529–30.

 Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, this Court does not reweigh the evidence or judge the credibility of the witnesses. *Fought v. State*, 898 N.E.2d 447, 450 (Ind.Ct.App.2008). We will consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. *Id.* A conviction may be based upon circumstantial evidence alone. *Id.* Reversal is appropriate only when reasonable persons would

not be able to form inferences as to each material element of the offense. *Id.*

 Indiana Code section 35–45–2–1(a) provides that "[a] person who communicates a threat to another person, with the intent ... that the other person be placed in fear of retaliation for a prior lawful act ... commits intimidation, a Class A misdemeanor." "Threats" include any "expression, by words or action, of an intention to ... unlawfully injure the person threatened or another person, or damage property." Ind.Code § 35–45–2–1(c). The parties agree that Marlow's statement to Ruthy—"[G]et your fat ass out of the car, I'm gonna beat you down"—constituted a threat under Section 35–45–2–1(c). We further conclude that Kenny's statements to Jamie and Amy—"I'll kill the bitch I swear to God, I will kill the bitch," and "[L]ittle boy if you know what's good for ya you'll stay away from Ruthy"—constituted threats for purposes of the statute.

 Marlow argues, however, that the State presented insufficient evidence that he intended to place the girls in fear of retaliation for their prior lawful conduct. Section 35–45–2–1(a) requires the State to prove that the victim engaged in a prior act which was not contrary to law and that the defendant intended to repay the victim for the prior lawful act. *Casey v. State*, 676 N.E.2d 1069, 1072 (Ind.Ct.App.1997). Mere proof that the victim is engaged in an act which is not illegal at the time the threat is made is not sufficient. *Id.* The State must establish that the legal act occurred prior to the threat and that the defendant intended to place the victim in fear of retaliation for that act. *Id.*

In *Casey*, the alleged victim Kimberly was with her friends at a bar. *Id.* at 1071. Casey was at the same bar and began fighting with one of Kimberly's friends. *Id.* Kimberly left and went home to watch

television with her boyfriend Russo and his friend Chapman. *Id.* Casey soon appeared on a ledge outside Kimberly's window. *Id.* Kimberly, Russo, and Chapman went outside to investigate. *Id.* Casey told Kimberly and her friends that they were surrounded by fifty people and should not try to run. *Id.* Kimberly pleaded with Casey to leave. *Id.* Casey told her, "Get inside bitch, you're next." *Id.* He asked one of his associates to get his gun from the car, and he stated that he was going to kill them all. *Id.* Casey then struck Russo with an aluminum bat and told Kimberly, "You're next bitch." *Id.* Casey was found guilty of intimidation, and on appeal we vacated the conviction. *Id.* at 1073. We held that the State failed to prove that Casey threatened Kimberly to place her in fear of retaliation for a prior lawful act. *Id.* The State argued that Kimberly had been engaged in the lawful acts of "being a patron at a bar, being at her house and being a witness to Casey's attack on Russo." *Id.* But we found that the record did not support an inference that Casey was threatening Kimberly for this particular conduct. *Id.* We also noted that "Casey's threats, which consisted of statement that 'You're next bitch' and that he was going to kill her, ... do not demonstrate his reasons for threatening Kimberly or indicate that he was doing so because of any specific prior act." *Id.*

Marlow argues that the facts of this case are similar to those addressed in *Casey* and are likewise insufficient to sustain an intimidation conviction. We disagree and believe *Casey* is distinguishable. The circumstances preceding the threats in *Casey* were vague: somehow Casey got into a fight with Kimberly's friend at a bar and Kimberly later returned home. Casey then went to Kimberly's house, threatened her, struck Russo with a bat, and threatened Kimberly again. The alleged prior lawful acts—being at bar, being at a house,

and witnessing an attack that took place after Casey had first threatened the victim—were either too weak or illogical to support an inference that they provoked Casey's intimidation. But in this case, the facts most favorable to the verdict reveal that Marlow and Derek were longtime bitter enemies. Marlow saw Jamie, Ruthy, and Amy cavorting with Derek on the side of the road. Shortly thereafter Marlow and Kenny allegedly threatened the girls. We believe that the bad blood between Derek and Marlow, the association between the three girls and Derek, and the ensuing confrontations together sustain an inference that Marlow was threatening the girls for their prior lawful conduct of fraternizing with Derek. *Cf. Norris v. State*, 755 N.E.2d 190, 191–92 (Ind.Ct.App.2001) (finding sufficient evidence to sustain intimidation conviction, where defendant threatened victim after victim denied defendant opportunity to see his children), *trans. denied; H.J. v. State*, 746 N.E.2d 400, 404 (Ind.Ct.App.2001) (finding sufficient evidence to sustain intimidation conviction, where defendant threatened victim after victim reported defendant to school authorities for making a hit list).

For the reasons stated, we find sufficient evidence to sustain Marlow's conviction for Class A misdemeanor intimidation. The State may therefore retry Marlow if it so chooses. We address Marlow's remaining arguments to the extent they may arise on remand.

### III. Jury Unanimity

▮ Marlow argues that the trial court committed fundamental error by permitting the State to charge and argue alternative victims in a single count of intimidation. He contends that the jury may have consequently returned a non-unanimous guilty verdict. Otherwise stated, the issue is whether the trial court erred by

not instructing the jury that they must reach a unanimous decision as to which victim, if any, Marlow intimidated.

■ Due process does not require jurors to agree on the means by which a crime was carried out, but it does require them to render a unanimous verdict as to which actual offense was perpetrated. *Schad v. Arizona,* 501 U.S. 624, 631–32, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991); *Richardson v. United States,* 526 U.S. 813, 820, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). In *Schad,* a plurality of the United States Supreme Court explained that a jury need not agree on the precise *actus reus* or *mens rea* with which an individual crime was committed. 501 U.S. at 631, 111 S.Ct. 2491. "[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line." *Id.* at 631–32, 111 S.Ct. 2491 (quoting *McKoy v. North Carolina,* 494 U.S. 433, 449, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990)). "That is not to say, however, that the Due Process Clause places no limits on a State's capacity to define different courses of conduct . . . as merely alternative means of committing a single offense, thereby permitting a defendant's conviction without jury agreement as to which course or state actually occurred." *Id.* at 632, 111 S.Ct. 2491. "[N]o person may be punished criminally save upon proof of some specific illegal conduct," and "the requisite specificity of the charge may not be compromised by the joining of separate offenses. . . ." *Id.* In a concurring opinion, Justice Scalia explained that "[w]e would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday. . . ." *Id.* at 651, 111 S.Ct. 2491. *See also Richardson,* 526 U.S. at 820, 119 S.Ct. 1707(6–3) (citing the *Schad* plurality opinion and Justice Scalia's hypothetical with approval).

Our own cases have illustrated the foregoing distinction. *See Taylor v. State,* 840 N.E.2d 324, 333 (Ind.2006); *Scuro v. State,* 849 N.E.2d 682, 687 (Ind.Ct.App.2006), *reh'g denied, trans. denied; Castillo v. State,* 734 N.E.2d 299, 303 (Ind.Ct.App. 2000), *reh'g denied.* In *Taylor,* our Supreme Court held that a jury did not have to agree whether the defendant was a principal or accomplice in the murder committed. 840 N.E.2d at 333. The Court held that "while jury unanimity is required as to the defendant's guilt, it is not required as to the theory of the defendant's culpability." *Id.* Meanwhile in *Scuro,* the defendant was charged with disseminating harmful material to victim D.D. 849 N.E.2d at 682. The State presented evidence of three different instances supporting the charge. *Id.* at 688. This Court held that because "Scuro was charged with only one count of dissemination to D.D. based on an unspecified incident, and given that the State presented evidence of three instances of dissemination to D.D., it is possible that the jury's verdict on Count V was not unanimous." *Id.* at 688–89. We therefore vacated the conviction. *Id.* at 689. Likewise in *Castillo,* the State alleged one unspecific act of dealing cocaine but produced evidence of two incidents that conformed to the charging information. 734 N.E.2d at 303. The State argued to the jury that they had "a choice" in convicting Castillo. We held the verdict may not have been unanimous and vacated the defendant's conviction. *Id.* at 305.

■ Here the State charged Marlow with communicating a "threat to another person, to-wit: Ruth Schreier, Jamie Baker and/or Amy Robertson, with the intent that the other person be placed in fear of retaliation for a prior lawful act." The State alleged multiple victims in the disjunctive and argued that Marlow either threatened the girls himself or aided and

induced Kenny's threats. The State was allowed to allege either principality or complicity without a unanimity instruction. *Taylor*, 840 N.E.2d at 333. But by arguing alternative victims—who were allegedly threatened at distinct periods of time on the night in question—the State actually charged Marlow with several alternative crimes. *Cf. Schad*, 501 U.S. at 651, 111 S.Ct. 2491 (Scalia, J., concurring). Some jurors may have found that Marlow threatened Ruthy outside the Laurel Apartments but did not aid or induce any of Kenny's threats to the girls. Others may have concluded that Marlow did not threaten any of the girls but did aid or induce Kenny's verbal and physical threats to Jamie or Amy. The jury therefore may have disagreed as to which crime occurred—not just the means by which a single offense was perpetrated. Accordingly, the trial court should have instructed jurors that they had to reach a unanimous verdict as to which crime, if any, Marlow committed.

For the foregoing reasons, we find the trial court erred by not issuing a unanimity instruction.

### IV. Evidence of Witness Bias

Marlow sought to introduce testimony of his former girlfriend, Candice Kolb, that she had received a threatening text message from Ruthy in January 2009. The defense proffered the evidence to attack Ruthy's credibility by showing her "animus directed against Marlow." Tr. p. 98. Candice brought her phone to trial and showed Ruthy's text message to the court. The State asked Candice to explain the text message outside the hearing of the jury:

DEFENSE ATTORNEY: Uh, my witness is here with her phone now, she, she, we were unable to get them to print out. She has her phone with her with the messages on them.

\* \* \* \* \* \*

[PROSECUTOR]: Okay, now when, when was this received by you?

CANDICE KOLB: Uh, January of this year, 2009.

PROSECUTOR: And what was it in regards to?

CANDICE KOLB: Uh, I woke up to that text and I'm not really sure why she was going off at me because I've been down at school in Evansville, Indiana. I haven't even been up here, and so I, I really have no clue as to why she would send a text like that to me, whenever I haven't been up here, I haven't been involved in anything.

DEFENSE ATTORNEY: (inaudible)

PROSECUTOR: I understand, but what was it, what was the message about, to you?

CANDICE KOLB: Well, pretty much she threatened me, I think she felt like I was causing trouble for her in some way. Um, which that is not the case. And so that's why she sent me the message. Um.

PROSECUTOR: Well, I think it refers to some things about what she's upset about, about lying.

COURT: Do you know what, what all that means, or?

CANDICE KOLB: At the time, some people were mad at her, she thought it was me because she originally had sent me a text, before this text that was really, really nasty and she, I think, she thought that I'd went and told these people therefore they are mad at her, which she loses her connection to whatever it is——

COURT: But——

CANDICE KOLB:——so.

COURT:——see what you're asking——

PROSECUTOR: It's got nothing to do with this——

COURT: is (inaudible)——

PROSECUTOR: it's got nothing to do——.

COURT:——what's the underlying? It, it, is the underlying issue the case we're here about today?

PROSECUTOR: Not on this. That's what she's saying. It was something completely different.

CANDICE KOLB: The reason why that I, I have, have this text is because she's threatening me, not only me but she's also saying having Marlow come down and fight me. But I know he's too scared to do it.

COURT: Well, you do you want to admit it?

CANDICE KOLB: I mean.

DEFENSE ATTORNEY: Yes.

COURT: H–How do you think it's relevant?

DEFENSE ATTORNEY: I think it shows that the, the animus here is on the entire other side than the way this, story is being told.

PROSECUTOR: But it's on a different issue. It's got nothing to do with this case, and it's after the fact. It's not——.

PROSECUTOR: That's what I'm a getting at. This is why we talk about prior bad acts, it's certainly what it, it's a whole different ball game you guys are talking about. Somebody's got upset, she heard something that you said to somebody else, and it wasn't true, and she's said you're lying and, and you didn't even say it.

CANDICE KOLB: Can I (inaudible) a couple, uh, suggestions?

COURT: Well, no. You want it admitted, right?

DEFENSE ATTORNEY: Yes. Yes, sir.

COURT: Okay. How's it, you, how's it relevant to October 2007?

DEFENSE ATTORNEY: Well, I (inaudible) intending to show that even before October these people had bad feelings directed at Marlow and that this is just ongoing thing and that these allegations are part of this whole ongoing——

COURT: But, I guess what I'm, how is she related to this incident at all?

DEFENSE ATTORNEY: Uh, she's his girlfriend.

COURT: She's Marlow's girlfriend?

DEFENSE ATTORNEY: Yes.

CANDICE KOLB: Um hmm. I mean, but, you know——

DEFENSE ATTORNEY: And this is just another, th-this allegation is just part of this whole pattern of, like I said, animus directed against Marlow, and this is just another example of it.

PROSECUTOR: You and Ruthy were good friends.

CANDICE KOLB: Used to be——

PROSECUTOR: That's what I mean——

CANDICE KOLB:——friends.

PROSECUTOR:——very good friends.

CANDICE KOLB: Yes.

PROSECUTOR: Yes. And, she texts you in that way and, you know, since that incident was still your friend, with Marlow.

CANDICE KOLB: Since this icci-incident, where her texting me?

PROSECUTOR: No, no, no. That's January this year. I'm talking about since October of '08, you were still, suh, friends with her.

CANDICE KOLB: I would not say friends. We didn't talk, it was a hello, goodbye situation——

PROSECUTOR: Right, that's what I mean.

CANDICE KOLB:——and we was acquaintances, we live in the same town with barely any people in there.

PROSECUTOR: I understand——

CANDICE KOLB:——so.

PROSECUTOR:——but where I have a point is this text is about something where she thought you said something about her and she's mad, calling you a lier cause it caused her problems. And you, I'm not saying you said them, but that's——

CANDICE KOLB: Yeah.

PROSECUTOR:——what she's saying.

CANDICE KOLB: And basically——

PROSECUTOR: And that's why we're saying——

PROSECUTOR:——how is that relevant.

DEFENSE ATTORNEY: It also makes reference to the fact that she wants to fight him, and she's offering to fight him.

COURT: In January of '09?

DEFENSE ATTORNEY: Right.

CANDICE KOLB: And things are still being instigate, you know? Things are still being agged on.

PROSECUTOR: This would be another crime if it is, I'd say.

COURT: I–I–I guess the reason I'm not going to let it in is because of number one, I–I–I don't think it's really relevant and two, I think it's confusing. I think it would confuse the Jurors as to what this is even about, when this was, and I don't think it's relevant to what happened October of '07. So, I (inaudible) gonna let it in.

*Id.* at 94, 96–100.

Marlow argues that the trial court erred by excluding the proffered text message and Candice's accompanying testimony.

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Wilson v. State,* 765 N.E.2d 1265, 1272 (Ind.2002). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Smith v. State,* 754 N.E.2d 502, 504 (Ind.2001). "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by a proper offer of proof, or was apparent from the context within which questions were asked." Ind. Evidence Rule 103(a).

 We first note that the defense's offer of proof on this issue was sorely lacking. The text message itself was never placed into the record, so we have no way of knowing what it actually said. We understand the difficulty in printing out messages from cell phones, but defense counsel could have taken a picture of the display or at the very least had the witness read the message aloud in court. *See also Hape v. State,* 903 N.E.2d 977, 989–91 (Ind.Ct.App.2009) (discussing authentication of text messages), *trans. denied.* We caution parties that this Court cannot review the propriety of evidentiary rulings if we are not furnished with the evidence in dispute.

 Having said that, we understand from the testimony above that the text message involved some sort of threat made by Ruthy toward Candice, and that the defense offered the message to show Ruthy's bias against the defendant. Indiana Evidence Rule 607 provides that the credibility of a witness may be attacked by any party. Evidence Rule 616 specifies that "[f]or the purpose of attacking the credibil-

ity of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible." Rule 616 provides for the admission of evidence showing bias or prejudice of a witness without any qualifications. *Ingram v. State,* 715 N.E.2d 405, 407 (Ind.1999). However, the rule should be read in conjunction with Rule 403's required balancing of probative value against the danger of unfair prejudice. *Id.* Evidence Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

Here the defense proffered Candice's text message pursuant to Rule 616 in order to show Ruthy's bias. The trial court therefore had discretion under Rule 403 to balance the probative value of the evidence against its potential for prejudice. We cannot say the trial court abused its discretion by excluding the evidence. First, the threatening text message was sent to Candice—as opposed to Marlow himself—so its probative value in showing animosity from Ruthy toward Marlow was already attenuated. We further agree with the trial court that the message was likely to confound the issues in the case. In order to explain the message, Candice testified that "[a]t the time, some people were mad at [Ruthy], she thought it was me because she originally had sent me a text, before this text that was really, really nasty and she, I think, she thought that I'd went and told these people therefore they are mad at her, which she loses her connection to whatever it is...." Contextualizing the message would have involved explanation of a number of collateral circumstances in an already convoluted case. The evidence therefore posed dangers of confusing the jury and creating undue delay. *See, e.g.,*

*Wood v. State,* 804 N.E.2d 1182, 1188–89 (Ind.Ct.App.2004).

For the foregoing reasons, we find the trial court did not err by excluding Ruthy's message.

Reversed and remanded.

BAILEY, J., and BRADFORD, J., concur.