Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 27 2013, 7:38 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**WILLIAM W. GOODEN**
Mt. Vernon, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JOSEPH Y. HO**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| TIMOTHY ALEX LEAR, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 65A01-1209-CR-426 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE POSEY CIRCUIT COURT
The Honorable James M. Redwine, Judge
Cause No. 65C01-1102-MR-64

June 27, 2013

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

While caring for his four-month-old son, Timothy Alex Lear observed blood coming from his son's nose and noticed that he was not breathing. The child died several hours later at the hospital from a subdural hematoma and herniation, or swelling, of the brain. Lear was convicted of murder and sentenced to sixty years. He now appeals, arguing that the trial court abused its discretion in admitting evidence of opinion testimony, prior bad acts, and prior injury to his son. He also argues that the evidence is insufficient to sustain his murder conviction. Finding that the trial court did not abuse its discretion in admitting the evidence and that the evidence is sufficient to sustain Lear's conviction, we affirm.

**Facts and Procedural History**

Lear and Maggie Clardy lived together in Mt. Vernon, Indiana, with their four-month-old son, B.C., and Maggie's one-year-old daughter. On February 14, 2011, Lear was caring for the two children at home while Maggie worked. While at work, Maggie received a phone call from Lear wanting to know where the ibuprofen was because he had heard B.C.'s arm pop. Maggie called her mother, Sandra Thompson, and asked her to check on B.C. When Sandra arrived, she found that B.C. was alert, yet whiny and favoring his arm. She did not notice any bruising or injuries to B.C., and she left with Maggie's daughter.

After playing video games for about an hour, Lear heard B.C. coughing. As he approached the crib where B.C. was laying, Lear noticed blood coming from B.C.'s nose. Lear called Sandra to return because B.C. stopped breathing; she instructed him to call

911.  Lear also contacted Maggie and told her to come home.  When Maggie arrived home, Lear met her outside and told her that he "didn't do anything."  Tr. p. 141.

John Dixon, an assistant fire chief of the City of Mt. Vernon Fire Department, responded to the 911 dispatch and observed that B.C. was unresponsive and not breathing when he arrived.  John and his partner, Ryan Riggs, performed CPR on B.C.  They both noticed abnormal bruising on B.C.'s abdomen.  The ambulance transported B.C. to the hospital, and Lear, Maggie, and Sandra drove together.  During their ride to the hospital, Lear said he did not know "what could have happened," prayed the baby would be okay, and said he would "never do anything wrong again."  *Id*.

The ambulance arrived at the emergency room at Deaconess Hospital in Evansville, and B.C. was attended to by Dr. Reuben Cohen.  B.C. was somewhat stabilized for a few hours.  However, after further CPR and resuscitation efforts failed, Dr. Cohen pronounced B.C. dead shortly before midnight.

The police conducted three interviews with Lear, all of which were audio and video recorded.  The first police interview was conducted by Detective John Dike of the City of Mt. Vernon Police Department at the hospital shortly after B.C.'s death.  Detective Dike informed Lear of his *Miranda* rights, and Lear signed a form waiving those rights.  *Id*. at 183-84.  During the interview, Lear claimed that when he "picked [B.C.] up, like by his forearms, like lifted him up, like you lift a baby up, to sit him up . . . his arm popped."  Ex. 25, p. 3.  Lear also denied striking B.C.  *Id*. at 25.

The following day, Dr. Elmo Griggs, a forensic pathologist with the Vanderburgh County Coroner's Office, conducted an autopsy on B.C. and determined the cause of

3

death to be a subdural hematoma and herniation, or swelling, of the brain and ruled the manner of death as a homicide. At trial, Dr. Griggs testified that the injuries to the brain were caused by acceleration and deceleration, such as shaking, throwing, or spinning a child around – commonly referred to as shaken baby syndrome. Dr. Griggs also observed several bruises and fractures during his autopsy, including a spiral fracture to the arm, and testified to those findings as well.

After attending the autopsy, Detective Dike interviewed Lear a second time at the New Harmony Police Department. Again, Detective Dike informed Lear of his *Miranda* rights, and Lear signed a form waiving those rights. Lear made a similar statement but with more detail as to how B.C.'s arm was injured. Lear was arrested following this interview.

The next day, Detective Dike interviewed Lear a third time, during which he admitted dropping B.C. and falling on top of him. Lear again waived his *Miranda* rights for his interview. Lear claimed he heard B.C.'s arm pop when he picked him up after the fall. When Detective Dike asked Lear why he did not tell Sandra that he dropped the baby and fell on him, Lear said that he "was scared" and "they were already worried that [he] was going to hurt [B.C.]" Appellant's App. p. 188.

On February 17, 2011, the State charged Lear with: Count I, murder; Count II, neglect of a dependent resulting in death as a Class A felony; and Count III, battery resulting in death as a Class A felony. Before trial, the court held a hearing concerning Lear's request to redact portions of his interviews with police. The trial court denied Lear's requests.

4

The trial court conducted a three-day jury trial in July 2012. At trial, Dr. Griggs testified that the injuries to the brain were caused by acceleration and deceleration, such as shaking, throwing, or spinning a child around – commonly referred to as shaken baby syndrome. There were no external injuries to B.C.'s skull. Dr. Griggs also observed fresh, recent, and old bruises and fractures on B.C.'s body during his autopsy and testified that this "constellation of injuries" indicated an ongoing pattern of abusive trauma. Tr. p. 223. Lear objected, but the trial court overruled his objection. Lear renewed his request to redact the portions of his interviews with police, but the trial court denied his requests.

The jury found Lear guilty of all three counts. Lear was sentenced to sixty years executed in the Department of Correction on Count I; the trial court determined that Counts II and III merged into Count I and did not sentence Lear on either of those two counts.

Lear now appeals.

**Discussion and Decision**

Lear raises multiple issues, which we condense, rephrase, and reorder as follows. First, he contends that the trial court improperly admitted opinion testimony. Second, Lear contends that the trial court improperly admitted evidence of his prior bad acts. Third, Lear contends that the trial court improperly admitted evidence of prior injury to B.C. Last, he contends that the evidence is insufficient to sustain his murder conviction.

**I.       Admission of Evidence**

5

We review a trial court's determination as to the admissibility of evidence for an abuse of discretion. *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). We will reverse only if a trial court's decision is clearly against the logic and effect of the facts and circumstances. *Id*. We will not reweigh the evidence and will consider any conflicting evidence in favor of the trial court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*.

## A. Inadmissible Opinion Testimony

Lear contends that the trial court erroneously admitted portions of Detective Dike's interview with him because it constituted inadmissible opinion testimony. First, he argues that Detective Dike stated "a medical opinion which he is not qualified to give." Appellant's App. p. 158. During a portion of the second interview, which occurred after the autopsy, Detective Dike made the following two statements to Lear:

> But it would be a nice, clean break. And, of course, what I'm explaining to you, is, that, when we look at the arm, and the bone, you can see where there's a twist . . . and that, that would be because somebody . . . was twisting when it happened.
>
> * * * * *
>
> Well, our belief was that, if the child was picked up and swung . . . that would, that would, would have been a possibility of causing a spiral fracture.

*Id*. at 180, 181 (formatting altered).

We find that Detective Dike was not stating a medical opinion; rather, he was confronting Lear with the evidence obtained during the autopsy that he attended. Furthermore, Dr. Griggs, who performed the autopsy, testified at length at trial to this

6

very evidence. Thus, the trial court did not err by admitting Detective Dike's statement to Lear.

Second, Lear argues that the trial court erroneously admitted the following portion of the interview:

> [Det. Dike]: . . . you know, they say 'The Truth Will Set You Free.'
> [Lear]: It's been killing me.
> [Det. Dike]: Yeah . . .
> [Lear]: I'm sorry I lied. I was j-, I was scared.
> [Det. Dike]: That's okay and we understand that. That's the reason when we was [sic] talking to you the other night and telling you that we wanted to get it all straightened out and make sure we knew what was going on, but as I sit here and listen to the information, and I, let's say I disagree what [sic] you're saying, and what the autopsy says, on the injury, because I'm not sure that we've covered everything in that . . . and it doesn't appear to have been that. It appears to have been something else a little more violent, or . . . something, a little, little different. . . .

*Id*. at 191 (formatting altered). Lear claims that because Detective Dike's statement challenged Lear's statement as to how B.C.'s injuries occurred, it was a statement concerning the truthfulness of Lear's testimony, which is prohibited under Indiana Evidence Rule 704(b).

Evidence Rule 704(b) states, "Witnesses may not testify to opinions concerning . . . the truth or falsity of allegations; whether a witness has testified truthfully . . . ." Ind. Evidence Rule 704(b). No witness, whether lay or expert, is competent to testify that another witness is or is not telling the truth. *Angleton v. State*, 686 N.E.2d 803, 812 (Ind. 1997) (quoting *Shepherd v. State*, 538 N.E.2d 242, 243 (Ind. 1989)). *See Prewitt v. State*, 819 N.E.2d 393, 413-14 (Ind. Ct. App. 2004) (opinion contradicting another witness not

7

violation of Rule 704(b) even when couched in terms of, "Although I'm not a firearms expert, I have been around weapons and know how much noise they make when they're discharged and I have a very difficult time believing or understanding that a gunshot in a bathroom where you have tiles, which would cause reverberation.").

We find this case similar to *Angelton*. In *Angelton*, the defendant argued that the officer improperly testified, "I do not believe a burglary occurred there [at the Angletons'], sir." 686 N.E.2d at 811. Because the defendant testified that there was in fact a burglary, he argued that the officer's testimony was a statement about the truthfulness of his testimony. Our Supreme Court found that the officer's opinion was rationally based on his perception of various burglaries he had previously investigated and the state of the Angletons' home, and his opinion was helpful to the clear determination of a fact in issue. Also, the Court found that the contradiction between the officer's opinion and other evidence did not turn the statement into an attack on the truthfulness of the defendant's testimony; rather, it was his opinion as to whether there was a burglary. Accordingly, the trial court made no error by admitting the officer's opinion testimony.

The same is true here. Detective Dike did not make a statement that Lear had testified untruthfully. Rather, Detective Dike simply stated his opinion as to what the injury appeared to be. The contradiction between his opinion and other evidence did not turn the statement into an attack on the truthfulness of Lear's testimony. Moreover, Lear admitted that he lied about how B.C's injuries occurred. Accordingly, the trial court did not err by admitting this portion of Detective Dike's statement.

8

## B. Prior Bad Acts

Lear next contends that the trial court erred when it admitted evidence of prior bad acts. Lear argues that admitting during the third police interview that he dropped B.C. and decided not to tell Sandra because "they were already worried that I was going to hurt [B.C.]" was suggestive of prior bad behavior. Appellant's Br. p. 11. While not evidence of a specific prior bad act, Lear claims that it is evident that "Maggie's family was of the opinion that he was a threat to [B.C.]" *Id.* at 12. We disagree.

Indiana Evidence Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Lear's statement to police was not suggestive of a prior bad act; instead, the statement was a product of his own state of mind in regard to how Maggie's family felt about him. Lear's state of mind is not an act covered by Evidence Rule 404(b). Moreover, there was no implication of any previous wrongdoing by Lear. The trial court did not abuse its discretion by admitting this evidence.

## C. Evidence of Prior Injury

Lear contends that the trial court abused its discretion by admitting Dr. Griggs' trial testimony concerning a prior injury to B.C. because it was irrelevant and unduly prejudicial. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. "All relevant evidence is admissible, except as otherwise provided by the United States or Indiana constitutions, by statute not in conflict with these rules, by these rules or by other rules

applicable in the courts of this State. Evidence which is not relevant is not admissible." Ind. Evidence Rule 402. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Ind. Evidence Rule 403.

At trial, Dr. Griggs testified about the six-week-old fractured right tibia that he found on B.C.'s body during the autopsy. Lear contends that the evidence of a prior leg injury to B.C. is irrelevant because there was no evidence offered as to who was present when B.C. sustained the fracture. He points out that Dr. Griggs described the fracture to be around six weeks old, which does not prove or disprove that Lear had committed any criminal act against B.C. The State acknowledges that the old fractured tibia does not prove that Lear is guilty of the instant offense but argues that the evidence is nonetheless relevant because it shows "the thoroughness of Dr. Griggs' autopsy and the reliability of his analysis." Appellee's Br. p. 21. We agree that the testimony has some probative value.

The potential danger that this evidence could mislead the jury is low. The State did not attempt to connect the fractured tibia to Lear in any way during Dr. Griggs' testimony. He testified that it was "a non displaced remote fracture of the right tibia or one of the bones of the lower leg on the right side, *and that was an old fracture.*" Tr. p. 212 (emphasis added). Any prejudice was diffused when Dr. Griggs specified that the fracture was older and therefore more remote to B.C.'s instant injuries.

10

The low prejudice of the prior injury is sufficient to support the trial court's decision to admit the evidence. We decline to find that the trial court abused its discretion in admitting the evidence.

## II.    Sufficiency of the Evidence

Lear next contends that the evidence is insufficient to sustain his conviction for the murder of B.C. Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor judge the credibility of the witnesses. *Lainhart v. State*, 916 N.E.2d 924, 939 (Ind. Ct. App. 2009). We will consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. *Id.* A conviction may be based upon circumstantial evidence alone. *Id.* Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Id.*

Lear contends that there is insufficient evidence that he knowingly or intentionally killed B.C., which Indiana Code section 35-42-1-1 requires, because Dr. Griggs could not specify the actions Lear took to cause the acceleration and deceleration and, ultimately, B.C.'s death.[1]

---

[1] Lear cites two cases where the defendant was not convicted of murder, and shaken baby syndrome was found to be the cause of death without any external injuries to the skull. *Santiago v. State*, 985 N.E.2d 760 (Ind. Ct. App. 2013); *Ray v. State*, 838 N.E.2d 480 (Ind. Ct. App. 2005). He argues that fatal injuries of the nature presented in this case without other evidence of *mens rea* and without external injuries are not considered to be sufficient to establish an intentional or knowing killing. However, these cases do not specifically address the issue at bar. In *Santiago*, the sole issue on appeal was whether the trial court abused its discretion in refusing a tendered jury instruction. In *Ray*, the prosecutor did not charge the defendant with murder. Therefore, Lear has failed to persuade us that the jury cannot infer intent to kill where a victim suffers shaken baby syndrome without external head injuries.

Here, the evidence shows that B.C. was injured when left alone in Lear's care. His nose was bleeding and he had stopped breathing. During Lear's third police interview, he admitted that he had lied about how B.C. was injured in his first and second police interviews. During this interview, he claimed that he accidentally fell on top of B.C. and his arm popped when Lear tried to pick him up. However, the evidence shows that the injuries were inconsistent with someone holding B.C. and accidentally falling to the floor, as Lear claimed. Dr. Griggs testified that "[i]f [Lear] fell on him . . . you would expect a more crushing injury, an injury apparent to the outside of the body, particularly the head." Tr. p. 224. Furthermore, Dr. Griggs testified that the only way to produce the injury that B.C. sustained to his brain would be a very forcible shake. *Id.* at 225-26. During the second interview, Detective Dike asked about B.C.'s ribs and before the detective mentioned anything about shaking, Lear divulged that he "never shook [his] son" or "grabbed him by the ribs or shook him or held him or squeezed him." Ex. 27, p. 25.

The autopsy showed that B.C. suffered multiple bruises, multiple broken bones, and substantial hemorrhaging and swelling which resulted in his death. Tr. p. 209-23. Dr. Griggs testified that the injuries were forceful, intentional, and not accidental. *Id.* at 223-27. In total, there were thirteen separate injuries to B.C. recorded in the autopsy report created by Dr. Griggs. *Id.* at 227.

Based on this evidence, the jury could infer that Lear intentionally shook, threw, or spun B.C. to cause his fatal injuries. Accordingly, the evidence is sufficient to support

Lear's conviction for the murder of B.C.

Affirmed.

KIRSCH, J., and PYLE, J., concur.