## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 18 2015, 9:54 am

CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Julie P. Verheye
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

Devon Fry,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 18, 2015

Court of Appeals Case No.
71A03-1407-CR-263

Appeal from the St. Joseph
Superior Court
The Honorable John M.
Marnocha, Judge
Cause No. 71D02-1305-FC-116

**Friedlander, Judge.**

Devon Fry appeals his conviction of Possession of a Destructive Device,[1] a class C felony, Pointing a Firearm,[2] a class D felony, Domestic Battery,[3] a class A misdemeanor, Resisting Law Enforcement,[4] a class A misdemeanor, and Battery,[5] a class A misdemeanor. Fry presents the following restated issues for review:

> 1. Did the trial court abuse its discretion in denying Fry's request to replace a juror with an alternate?
>
> 2. Did the prosecutor commit misconduct, resulting in fundamental error?
>
> 3. Was the evidence sufficient to sustain Fry's conviction for possession of a destructive device?

We affirm.

---

[1] The version of the governing statute, i.e., Ind. Code Ann. § 35-47.5-5-2(1) (West, Westlaw 2013) in effect at the time this offense was committed classified it as a class A felony. This statute has since been revised and in its current form reclassifies this as a Level 5 felony. *See* I.C. 35-47.5-5-2(1) (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through February 23, 2015). The new classification, however, applies only to offenses committed on or after July 1, 2014. *See id.* Because this offense was committed before then, it retains the former classification.

[2] 2 The version of the governing statute, i.e., Ind. Code Ann. § 35-47-4-3(b) (West, Westlaw 2013) in effect at the time this offense was committed classified it as a class A felony. This statute has since been revised and in its current form reclassifies this as a Level 6 felony. *See* I.C. § 35-47-4-3(b) (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through February 23, 2015). The new classification, however, applies only to offenses committed on or after July 1, 2014. *See id.* Because this offense was committed before then, it retains the former classification.

[3] Ind. Code Ann. § 35-42-2-1.3(a)(2) (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through February 23, 2015).

[4] Ind. Code Ann. § 35-44.1-3-1(a)(1) (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through February 23, 2015).

[5] I.C. § 35-42-2-1(a)(1)(B) (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through February 23, 2015).

[3]     The facts favorable to the conviction are that on January 26, 2013, Fry lived with his girlfriend, M.R.  After the two consumed a large quantity of whiskey that day, they argued and Fry left the house.  He returned home later, unannounced, and surprised M.R. in the living room.  Armed with a silver revolver, Fry threatened to kill himself.  When M.R. attempted to take the gun away from him, Fry tapped the gun against her head and told her he would shoot her and then shoot at police officers so they would shoot him.  At that point, Fry and M.R. struggled over possession of the gun.  During the struggle, Fry picked M.R. up and threw her over a chair.  He then struck M.R. in the face.

[4]     While Fry thereafter paced between rooms, M.R. called 911.  Fry went to the basement of the home, retrieved weapons he had stored there, and began taking them to his vehicle outside.  At this point, officers from the South Bend Police Department (SBPD) arrived and M.R. informed them that Fry was armed and had threatened to kill her and the police.  Shortly thereafter, Fry exited the house and walked toward the officers, who drew their weapons and ordered Fry several times to stop.  He refused to obey the commands.  The officers approached Fry and attempted to handcuff him.  When Fry struggled with them, the officers placed him on the ground, and after a moment, Fry briefly calmed down.  When the officers again attempted to handcuff him, Fry grabbed an officer's leg and tried unsuccessfully to punch the officer.  Police eventually managed to subdue Fry and place him in handcuffs.  When they patted him

down, they found a pocket knife, but not the gun that M.R. had described. M.R. gave police permission to search her home.

[5] Officers went to the basement and saw a gun cabinet. A glass door enclosed the top portion of the cabinet. Through the glass, police observed two rifles inside the cabinet. The bottom portion of the cabinet was enclosed with a wooden door. Officer Michael Janicki opened that door and observed "miscellaneous gun equipment." *Transcript* at 357. He also saw what he described as "two packages … that had a fuse coming out of them." *Id.* Concerned that the package might be "some kind of an explosive device", *id.*, Officer Janicki called the SBPD bomb squad and asked for someone to come to the scene and inspect the device and advise as to whether it could be safely removed. Officer Janicki continued to search the house and discovered a silver handgun matching the description of the one M.R. had described. The handgun was found underneath a couch in the basement, near the gun cabinet.

[6] Officer D.J. Vohs of the SBPD bomb squad arrived at the scene to secure the devices. He found two items wrapped in green tape, each with a fuse protruding from it. After determining that he could do so safely, he removed them and later dismantled them. Under the tape, he found a $CO_2$ canister, such as is commonly used in pellet guns. A fuse ran into the $CO_2$ container, which was full of a powder that acted as a propellant when ignited. Outside of the $CO_2$ canister, but wrapped inside the tape, Officer Vohs found a large number of .177-caliber BBs. Officer Vohs recognized these devices as what are

commonly known as "crickets." *Id.* at 412. A cricket is a destructive device designed to propel destructive material outward once detonated.

[7] Shortly after the events of that evening, Fry and M.R. briefly reconciled and M.R. wrote several letters recanting her claims because she did not want Fry to be prosecuted. According to M.R., Fry made her write the letters and told her what to write.

[8] On May 21, 2013, the State charged Fry with pointing a firearm as a class D felony, two counts of domestic battery as class A misdemeanors, battery on an officer as a class A misdemeanor, resisting law enforcement as a class A misdemeanor, and possession of a destructive device as a class C felony. The two domestic-battery charges were later consolidated into a single charge. Following a jury trial, Fry was convicted on all five counts. The trial court sentenced Fry to four years for the class C felony, eighteen months for the class D felony, and one year each for the domestic battery, battery on an officer, and resisting law enforcement convictions. The four-year sentence was ordered to be served consecutive to the other sentences, which in turn were ordered to be served concurrent to each other. Thus, Fry received an aggregate sentence of five and one-half years. Further facts will be provided where relevant.

1.

[9] Fry contends the trial court abused its discretion in denying his request to replace a juror with an alternate. Pursuant to article 1, § 13 of the Indiana Constitution, which guarantees a defendant's right to an impartial jury, a biased

juror must be dismissed. Ind. Trial Rule 47(B) provides, in pertinent part, "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties." Trial courts have broad discretion in determining whether to replace a juror with an alternate, and we will reverse its determinations in this respect only where we find them to be arbitrary, capricious, or an abuse of discretion. *May v. State*, 716 N.E.2d 419 (Ind. 1999).

[10] After Officer Vohs testified, juror Durand sent a note to the court stating: "I've known Mr. Vohs from my job at Notre Dame. He trained in CPR and explosions." *Transcript* at 441. Outside the presence of the other jurors, the trial court questioned juror Durand. Juror Durand explained that she had attended training sessions provided by Officer Vohs and University security. She told the court that she had not recognized Officer Vohs's name from the witness list. Juror Durand further stated, "I don't think that it would cause me to be unfair either way. … It's not like I knew him from before or known [sic] him longer." *Id.* at 445. The court discussed the matter with the attorneys and Fry's counsel opined that Durand must be dismissed and replaced with an alternate juror. Following the conference with counsel, the court asked Durand, "Do you believe you could follow the instructions of the Court concerning the law and judge each of the witnesses, including Mr. Vohs, the same?" *Id.* at 446. She answered, "Absolutely." *Id.* Fry appeals the trial court's decision to not replace juror Durand.

[11] Durand was instructed by Vohs on the subject of explosives in the course of her employment at Notre Dame. According to Fry, "[t]his situation was not simply a casual work relationship." *Appellant's Brief* at 15. Rather, Fry claims she was Vohs's student in the subject that was also the subject of his trial testimony. Fry contends that this was enough to support an implication of bias on Durand's part and thus required her replacement.

[12] We reject the claim that Vohs's "relationship" with Fry was anything more than a casual work relationship. To the contrary, Durand informed the court that Vohs had assisted in her routine training on the subject of CPR and explosives in conjunction with her employment at the University and that she had known him for a period of only four months. Further, she testified that she did not even recognize his name when it appeared on the witness list. Moreover, and significantly, Vohs offered expert testimony regarding the nature of the devices (i.e., that they *were* explosive devices) found in the bottom compartment of Fry's gun cabinet. It does not appear that the nature of the devices was seriously contested at trial. Under these circumstances, the trial court's refusal to replace juror Durand with an alternate was not arbitrary, capricious, or an abuse of discretion.

2.

[13] Fry contends the prosecutor committed misconduct in three respects, each constituting fundamental error. We review a claim of prosecutorial misconduct by determining (1) whether misconduct occurred, and if so, (2) "whether the

misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected" otherwise. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (quoting *Cooper v. State,* 854 N.E.2d 831, 835 (Ind. 2006)), *reh'g denied*. Placing a defendant in grave peril, by itself, is not misconduct. *Ryan v. State*, 9 N.E.3d 663. "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by *the probable persuasive effect* of the misconduct *on the jury's decision* rather than the degree of impropriety of the conduct." *Id.* at 667 (quoting *Cooper v. State*, 854 N.E.2d at 835) (emphasis in original). In order to preserve a claim of prosecutorial misconduct, the defendant must, at the time the alleged misconduct is committed, request a jury admonishment. *Ryan v. State*, 9 N.E.3d 663. When a defendant fails to do this, he or she must establish both that the grounds for prosecutorial misconduct are present and that the prosecutorial misconduct constituted fundamental error. *Id.*

[14] Fundamental error is an "extremely narrow" exception to the waiver rule and places a "heavy burden" on a defendant to show that the alleged errors are so prejudicial to the defendant's rights as to "'make a fair trial impossible.'" *Id.* at 668 (quoting *Benson v. State,* 762 N.E.2d 748, 756 (Ind. 2002)). Thus, to establish fundamental error, the defendant must show that the alleged errors (a) "'constitute clearly blatant violations of basic and elementary principles of due process'" and (b) "'present an undeniable and substantial potential for harm.'" *Id.* (quoting *Benson v. State,* 762 N.E.2d at 756). "Harm" in this context

"depends upon whether [the defendant's] right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled." *Id*. (quoting *Townsend v. State,* 632 N.E.2d 727, 730 (Ind. 1994)).

> In evaluating the issue of fundamental error, our task in this case is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such *an undeniable and substantial effect on the jury's decision* that a fair trial was impossible.

*Id.* (emphasis in original).

[15]     Our Supreme Court has stressed that "[a] finding of fundamental error essentially means that the trial judge erred ... by not acting when he or she should have...." *Id.* (quoting *Whiting v. State,* 969 N.E.2d 24, 34 (Ind. 2012)). This doctrine provides a means for appellate courts to correct egregious and blatant trial errors that otherwise would have been procedurally barred. *Ryan v. State*, 9 N.E.3d 663. It is not meant to afford defense counsel a second bite at the apple where counsel "ignorantly, carelessly, or strategically fail[ed] to preserve an error." *Id.* at 668. Our Supreme Court has further noted that a defendant is "'highly unlikely' to prevail on a claim of fundamental error relating to prosecutorial misconduct". *Id.* (quoting *Stevens v. State,* 691 N.E.2d 412, 420 n.2 (Ind. 1997), *cert. denied*, 525 U.S. 102 (1998)).

[16]     Fry cites three instances of alleged prosecutorial misconduct that he claims amounted to fundamental error. The first occurred during his cross-

examination by Deputy Prosecutor Linda Lawder. Some background facts are necessary to understand the context of this exchange. Fry had installed surveillance cameras at the house that was the scene of this occurrence. There were a total of four cameras in the system, and they monitored the outside of the house and the front porch. The cameras provided a live feed that could be viewed on the television in the living room of the house and the system was attached to a DVR that recorded the camera feeds. The DVR was located upstairs in the house. Police officers on the scene that night testified that they observed the live feeds displayed on the television that evening, but they did not locate any recording equipment. M.R. testified that sometime after the present crime, Fry returned to the house and disabled the surveillance equipment such that the system no longer worked.

[17] Upon direct examination at trial, Fry testified that he did not know what became of the footage from the surveillance cameras that night. He was asked if it had been provided to his attorney as part of the discovery process. He responded, "[i]t was supposed to have been", but it had not been provided. *Transcript* at 497. During Fry's cross-examination, the following exchange occurred:

> A.　I did not get my surveillance equipment.
>
> Q.　Okay, you didn't get … Oh, it's your surveillance equipment now, I thought before it was her surveillance equipment?
>
> A.　No, I said it was hers.
>
> Q.　Okay.
>
> A.　I didn't get that surveillance equipment.
>
> Q.　Okay. Isn't it true that you could have gone over there right after and gotten that surveillance equipment, if it was so

important to you to get; isn't that true? You could have gone and done that.

A. I probably could have.

Q. Yes, okay, so you could have. But isn't it true that you never told the State, you never told the police officers or anybody, that this surveillance equipment was recording, until in court –

A. Nobody asked me.

Q. -- isn't that true?

A. Nobody asked me.

Q. But you never told anyone?

A. I haven't even made a statement.

Q. Okay, that's true, yeah.

And isn't it that's why no one can see it, because you did go and get it and it's destroyed?

A. No.

Q. Okay. If it even recorded, right?

A. It was recording.

Q. Okay. How often did you go and like watch your recordings and check that the recording actually works?

A. I didn't.

Q. You didn't, okay.

A. I just put the surveillance equipment in that December. It didn't even go through the ten thousand hours yet, so …

Q. Well, you don't know, you just told us you didn't check it.

A. No, I didn't check it.

Q. Okay, so you don't know.

*Id.* at 533-34. Fry contends that in this line of questioning, the prosecutor "was clearly impeaching Fry's testimony with his post arrest silence. Her questions implied that he had some sort of duty or obligation to come forward with his explanation to either the police or the prosecutor prior to offering his

explanation at trial." *Appellant's Brief* at 19. Fry continues that the use of a defendant's silence at the time of arrest and after receiving *Miranda* warnings violates the Due Process Clause of the Fourteenth Amendment.

[18] Fry's contention in this regard alleges a so-called *Doyle* violation, which rests upon *Doyle v. Ohio*, 426 U.S. 610 (1976). "In *Doyle,* the Court held that under the Fourteenth Amendment a prosecutor may not use the silence of a defendant who's been arrested and Mirandized to impeach the defendant." *Trice v. State*, 766 N.E.2d 1180, 1182 (Ind. 2002). "Where a defendant asserts a *Doyle* violation, he 'ordinarily bears the burden of showing that *Miranda* warnings were given prior to the post-arrest silence used by the state for impeachment purposes.'" *Lainhart v. State*, 916 N.E.2d 924, 936 (Ind. Ct. App. 2009) (quoting 3 Wayne R. LaFave, *Criminal Procedure* § 9.6(a) n. 47 (3d ed. 2007)).

[19] In the present case, Fry presented no such evidence, and our search of the appellate materials does not reveal any indication that he was *Mirandized* in the first place, much less when that would have occurred. Thus, Fry has not demonstrated that the State induced his silence through a *Miranda* warning, which is the due process violation that *Doyle* was intended to redress. *See Doyle v. Ohio*, 426 U.S. at 618 (the *Miranda* warning's assurance "that silence will carry no penalty … is implicit to any person who receives the warnings. In such circumstances it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial").

[20]    Even assuming for the sake of argument, however, that a *Doyle* violation occurred here, the use of a defendant's post-arrest silence to impeach the defendant is subject to harmless-error analysis. *Sobolewski v. State*, 889 N.E.2d 849 (Ind. Ct. App. 2008), *trans. denied.* Even an error of constitutional dimension may be deemed harmless "if it is clear beyond a reasonable doubt that the error did not contribute to the defendant's conviction." *Id.* at 857. We consider the following factors when deciding whether a *Doyle* violation is harmless beyond a reasonable doubt:

> (1) [T]he use to which the prosecution puts the post-arrest silence; (2) who elected to pursue the line of questioning; (3) the quantum of other evidence indicative of guilt; (4) the intensity and frequency of the reference; and (5) the availability to the trial court of an opportunity to grant a motion for mistrial or give a curative instruction.

*Id.*

[21]    During his direct examination, Fry implied that the State had taken surveillance tapes from the surveillance system in M.R.'s home. Fry also claimed the State had failed to turn over those tapes during discovery. The State not only denied that it had the surveillance tapes in its possession, but by implication also denied even knowing that the surveillance system in M.R.'s home was capable of recording images in the first place. Fry was asked rhetorically whether he could have gone to M.R.'s home and retrieved the tapes himself, and he admitted that he could have. The State then questioned Fry why he had not told anyone, including the police officers involved in the investigation, about the recording capability of the surveillance equipment in M.R.'s home. This

was clearly done in response to Fry's testimony insinuating that the State was in possession of the recordings and chose not to give them to Fry. In fact, the State went on to imply through questioning of Fry that Fry had, in fact, destroyed the surveillance equipment.[6]

[22] In any event, the State used the post-arrest silence in response to Fry's apparently inaccurate claim that the State was in possession of surveillance recordings from M.R.'s house. This was the only time the subject was mentioned at trial. Against this brief, isolated reference to Fry's failure to divulge to police the existence of the recording equipment and possibly a tape recording of the night in question there was ample evidence of Fry's guilt. Namely, the devices were found in a cabinet that Fry built, which was located in the basement of the home in which he was living, and which contained firearms that he admitted were his. In view of the overwhelming evidence of Fry's guilt, we conclude that it is clear beyond a reasonable doubt that any error in the use of Fry's post-arrest silence did not contribute to his conviction, and therefore, was harmless. Accordingly, the questions of which Fry complains concerning his post-arrest silence do not constitute fundamental error.

---

[6] When M.R. was asked whether the surveillance equipment was still at her house, she replied: "the cameras are, the mechanism no longer works. [Fry] made sure he took that with [sic] or took it apart, it doesn't work any longer." *Transcript* at 230. She went on to testify that Fry took it sometime after the night of this occurrence. She testified that, to her knowledge, the police made no effort to recover any surveillance tapes depicting the events of January 26.

The second alleged instance of prosecutorial misconduct centered upon another point in Fry's cross-examination in which the prosecutor asked him about his knowledge of the presence of the destructive devices in the gun cabinet. During his direct examination, Fry testified that he and M.R. had a New Year's Eve party at their house and among the guests were men named Josh and Neil. According to Fry, Josh and Neil brought three explosive devices to the party, one of which they set off at around midnight. Fry claimed that when they prepared to set off another one, he stopped them and told them the party was over. At that point, according to Fry, he set the two remaining devices on a counter near the patio. He claimed at trial that the next time he saw those two devices was when they were introduced into evidence at trial. During this discussion, the following exchange occurred between Fry and Lawder:

> Q.  [Josh and Neil brought the devices to your home on] New
> Years [sic] Eve, January 1st, correct?
> A.  Uh-huh (affirmative).
> Q.  This incident, January 26th, correct?
> A.  Uh-huh (affirmative).
> Q.  Isn't it true that in between that time [sic] you actually saw
> those devices in your gun cabinet?
> A.  No.
> Q.  So it's your testimony that they were not there until that day,
> until January 26, they showed up there?
> A.  I don't know when they showed up there.
> Q.  But Josh isn't here to defend himself, is he?

*Transcript* at 540. According to Fry, the "clear implication" of this line of questioning "was that Fry made up a story to tell in court and suggested that Fry had the burden of producing Josh or Neil as witnesses in his trial or that he had to provide this explanation to the police or the prosecutor prior to his testimony." *Appellant's Brief* at 21. Once again, Fry's counsel did not object to this line of questioning. Therefore, he must demonstrate fundamental error in order to gain reversal.

[24] Fry's argument fails for several reasons, prominent among which is the fact that his post-*Miranda* silence was not mentioned, or even alluded to, in the prosecutor's questions. We note, as we did with the first claim of prosecutorial misconduct, that Fry has failed to establish if and when he was *Mirandized*. Moreover, the only silence alluded to in the prosecutor's questions was that of Josh, who was not called to testify at trial. Therefore, this brief line of questioning was not a comment upon Fry's post-*Miranda* silence, such as is required to establish a *Doyle* violation. Once again, Fry has failed to establish that the prosecutor's comments constituted fundamental error.

[25] The third and final claim of alleged prosecutorial misconduct occurred during closing argument. At trial, Fry testified that the silver handgun found under the couch in the basement when the police searched M.R.'s house belonged to Joetta Baker. Baker was a friend of Fry's at the time this incident occurred, but was married to Fry by the time of trial. During closing argument, the prosecutor stated:

> Do you know how [the silver handgun] got there? He put it there. He knew the police were outside, he knew he had done something wrong and he went and put it there. He knew he pointed that firearm at her and he didn't want the police to find it.
>
> Now that's what she tells us, that's what the police tell us where they found it. What he said yesterday, is that it's Joetta's firearm.
>
> This is one of those things that we talked about like the cell phone. What color is the cell phone that we talked about on voir dire that was taken? I don't have to prove what color it is. I don't have to prove if it's his gun or if it's Joetta's gun, it doesn't matter. It could be either one, but I just have to prove that he pointed it at her.
>
> Let's go along with what he's saying, okay, it's Joetta's gun. It's Joetta's gun, a woman who Melissa had never met, he had dated before, and is in Kentucky at the time, who is now his wife. She didn't come into court, though, and say it was her gun. She didn't say she even lost it in this house.
>
> How when they have been living in this house for three months, does this firearm get lost under his couch, when she doesn't even live in the same state[?]

*Transcript* at 87. According to Fry, this constituted prosecutorial misconduct in that it suggested to the jury that Fry had the burden of proof because it questioned why he did not call a witness to testify on his behalf or to corroborate his own testimony.

[26]   As with the other claims of prosecutorial misconduct, Fry did not preserve it by making a contemporaneous objection and request for admonishment and mistrial. Therefore, he must establish both the grounds for prosecutorial misconduct as well as the grounds for fundamental error in order to succeed. *Ryan v. State*, 9 N.E.3d 663. We have held that it is improper for the prosecutor to suggest that the defendant bears some burden of proof. *See Lainhart v. State*, 916

N.E.2d at 936 (stating that "[w]hile the State may argue to the jury the uncontradicted nature of its own case, the State may not suggest that the defendant has the burden of proof by inquiring in closing argument why the defendant did not call witnesses to testify on his behalf"). We cannot, however, agree with Fry that the prosecutor's comments were focused upon the fact that Fry did not call witnesses to establish evidence consistent with his narrative about what occurred that evening. Rather, the prosecutor's comments conveyed the implausibility of a portion of Fry's narrative, i.e., that the gun found under the couch in his basement was placed there by a woman who lived in a different state.

[27] Moreover, even if we accepted for the sake of argument that the prosecutor's comments somehow conveyed the notion that Fry had the burden of proof, such would not compel reversal. In *Flowers v. State*, 738 N.E.2d 1051 (Ind. 2000), the prosecutor made comments about the defendant's failure to call witnesses. Those comments may have suggested that the defendant bore some burden of proof. Our Supreme Court held, however, that "the jury here was properly instructed that the defendant was not required to present any evidence or prove his innocence. Accordingly we find that any impropriety in the prosecutor's closing argument was *de minimis* and overcome by the preliminary and final instructions." *Id*. at 1059.

[28] The record indicates that in both its preliminary and final instructions, the trial court advised the jury:

> Under the law of this state a person charged with a crime is presumed to be innocent. To overcome this presumption of innocence, the State

must prove the defendant guilty of each essential element of the crime or crimes charged beyond a reasonable doubt.

Because he is presumed to be innocent, the defendant is not required to present any evidence to prove his innocence or to provide any explanation.

*Transcript* at 164 and 625. As in *Flowers*, the jury was properly instructed that Fry was not required to present any evidence or prove his innocence. As a result, any impropriety in the prosecutor's closing argument was *de minimis* and the error was overcome by the trial court's preliminary and final instructions. *See Flowers v. State*, 738 N.E.2d 1051. The comments of which Fry complains do not constitute fundamental error.

## 3.

[29] Fry contends the evidence was insufficient to support his conviction for possession of a destructive device. Specifically, he contends the evidence failed to show that he "possessed" the destructive devices. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Thang v. State*, 10 N.E.3d 1256 (Ind. 2014). We consider only "the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id.* at 1258 (quoting *Henley v. State*, 881 N.E.2d 639, 652 (Ind. 2008)). We will affirm a conviction "if there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.* A verdict of guilt may be based upon an inference that is reasonably drawn from the evidence. All

inferences are viewed in a light most favorable to the conviction. *Bailey v. State*, 979 N.E.2d 133 (Ind. 2012).

[30] Pursuant to the version of I.C. § 35-47.5-5-2(1) in effect at the time of these events, "[a] person who knowingly or intentionally possesses a destructive device, unless authorized by law, commits a class C felony." Fry does not dispute that the two devices upon which this conviction was based were destructive devices. He contends, however, that the evidence did not establish that he possessed them.

[31] Possession of contraband can be established by either actual or constructive possession. *Houston v. State*, 997 N.E.2d 407 (Ind. Ct. App. 2013). Constructive possession has been explained thus:

> Constructive possession is established by showing that the defendant has the intent and capability to maintain dominion and control over the contraband.... [W]hen possession of the premises is non-exclusive, the inference [of control] is not permitted absent some additional circumstances indicating knowledge of the presence of the contraband and the ability to control it. Among the recognized "additional circumstances" are: (1) incriminating statements by the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the contraband; (5) contraband is in plain view; and (6) location of the contraband is in close proximity to items owned by the defendant.

*Holmes v. State,* 785 N.E.2d 658, 660 (Ind. Ct. App. 2003).

[32] Fry did not have exclusive possession of the home because he shared the home with M.R. In such cases, an inference of control will be permitted if there are,

in addition to the presence of the contraband, "additional circumstances indicating knowledge" of the contraband and the ability to control it. *Houston v. State*, 997 N.E.2d 407 (Ind. Ct. App. 2013). The destructive devices were found in a gun cabinet that Fry owned, built, and used, which was located in the basement of the home he shared with M.R. The basement where the cabinet was located was primarily used by Fry. He decorated it with wall coverings and stored personal possessions in the area. The basement bathroom was primarily used by Fry. M.R. testified that she went into the basement only to sleep and do laundry. The destructive devices were located in the bottom compartment of the cabinet, and situated next to ammunition for Fry's guns. Fry owned a gun that was located in the top of the cabinet at the time. Also, there was another gun in the top of the cabinet, which was owned by a friend of Fry's and stored in the cabinet with Fry's permission. Fry generally kept the cabinet locked.

[33] We are also mindful that Fry admitted that he was in actual possession of the devices at the New Year's Eve party, when he claimed to have taken them from friends and placed them somewhere in his home. Taken together, this evidence was such that a jury could reasonably conclude that Fry had both the knowledge of the presence of the devices and the ability to control them. Therefore, the State presented sufficient evidence to prove he "possessed" the devices within the meaning of I.C. § 35-47.5-5-2(1).

[34] Judgment affirmed.

Kirsch, J., and Crone, J., concur.