## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 28 2016, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia M. Carter
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Julius Anderson,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

April 28, 2016

Court of Appeals Case No.
71A04-1003-CR-162

Appeal from the St. Joseph
Superior Court

The Honorable Jane Woodward
Miller, Judge

Trial Court Cause No.
71D01-0904-MR-14

**Crone, Judge.**

## Case Summary

Julius Anderson appeals his conviction and fifty-five-year sentence for murder following a jury trial. He argues that the prosecutor committed misconduct during cross-examination and closing argument in the form of a *Doyle* violation which amounted to fundamental error. He also contends that the trial court abused its discretion during sentencing. Concluding that Anderson has not demonstrated that fundamental error occurred or that the trial court abused its discretion, we affirm his conviction and sentence.

## Facts and Procedural History

In the early morning hours on April 21, 2009, Anderson and his girlfriend, Dawn Brooks, were out partying and driving around with another couple, Terrence Eppenger, Jr. ("Terrence Jr."), and Christine Purucker. The couples stopped at a local convenience store for "some chips" and "smokes." Tr. at 469. Anderson and Brooks entered the store while Terrence Jr. and Purucker stayed in the car. While in the store, Brooks ran into an old friend, Kerry Montgomery, and gave him a hug and got his phone number. Anderson was "very upset" about the interaction between Brooks and Montgomery to the extent that he would not let Montgomery leave the store. *Id*. at 332. Montgomery tried to explain that he was married and that he and Brooks were just friends, but Anderson would not listen and instead hollered "crazy stuff" at Montgomery. *Id*. at 342. Montgomery was scared. The convenience store cashier eventually asked all of them to leave. Montgomery saw Anderson and Brooks get into the car with another couple and drive away.

[3] Terrence Jr. and Purucker dropped off Anderson and Brooks at Brooks's home and then drove to Terrence Eppenger, Sr.'s house ("Terrence Sr.") and went to bed in the basement. A little while later, Terrence Sr. was watching television in his bedroom when he was startled by pounding on the window. Terrence Sr. saw Anderson outside the window and told him to go around to the front door. Anderson "barged" into the house and tried to run to the basement. *Id.* at 427. Terrence Sr. stopped Anderson and told him that Terrence Jr. and Purucker were sleeping and that he could not go into the basement. Terrence Sr. observed blood on Anderson's arm. Terrence Sr. thought that Anderson must be bleeding and asked him what had happened. Anderson replied that "it wasn't blood." *Id.* Terrence Sr. was skeptical and dialed 911. Anderson said "don't call the police," so Terrence Sr. hung up. *Id.* However, because Terrence Sr. had already dialed the number, an emergency dispatcher called him back. As Terrence Sr. was explaining the situation to the dispatcher, Anderson took off out the front door and ran away.

[4] At 3:35 a.m., South Bend Police Corporal Tim Cichowicz was dispatched to Terrence Sr.'s home based on a report that a man had shown up at the home covered in blood. Corporal Cichowicz spoke with Terrence Sr. and Purucker. They told the officer that Anderson had arrived at the residence covered in blood and Purucker stated that she could show the officer where Anderson lived with Brooks. Purucker got into the police vehicle and directed Corporal Cichowicz to Brooks's home.

[5] When Corporal Cichowicz pulled up to Brooks's home, he noticed smoke coming from the roof. After he observed more smoke coming from the west side of the home, Corporal Cichowicz contacted dispatch and told them to send the fire department. To keep Purucker safe, Corporal Cichowicz quickly drove her back to Terrence Sr.'s house, before returning to Brooks's home. The fire department had not yet arrived, but other police officers were now on the scene. South Bend Police Officer Anthony Dawson broke a window of the home and yelled to see if anyone was inside. He then tried to open the front door of the home, and although the knob would turn, he was unable to push the door open. Officers went to the back of the house and noticed blood on the back door and in several other areas.

[6] It had begun to rain by the time the fire department trucks and other emergency vehicles arrived. Firefighters had difficulty getting through the front door and discovered that a couch had been blocking the entry. After gaining entry to the home, the firefighters found Brooks's body. She "was almost completely nude, except for a bra which was around her neck." *Id*. at 174. She was unresponsive with no "signs of life." *Id*. Her body was placed in an ambulance and Corporal Cichowicz accompanied the ambulance to the morgue.

[7] Around the same time period, Scott Sousa and his girlfriend Kai Legge were awakened to the sound of Sousa's barking dog. When they investigated, they found Anderson lying on the floor of the back porch of Sousa's apartment. Sousa did not know Anderson very well. Sousa allowed Anderson inside his apartment and observed that Anderson was "covered in blood" but did not

appear to be injured in any way. *Id*. at 280. After Sousa helped clean Anderson up, Sousa saw that Anderson had a cut on his finger. Sousa believed that all of the blood was much more than would have come from just a cut on Anderson's finger. Anderson told Sousa he had been in a fight at Brooks's house with "a person" and that it was "somebody that knew [Brooks]." *Id*. at 281. Anderson mentioned a fire in the house, that he jumped out the window, and that he "didn't know if the person he was fighting was hurt or dead, but he stabbed them." *Id*. Anderson instructed Sousa not to call the police.

[8] Sousa noted that Anderson "kept changing his story" and "didn't seem to know what story" to tell him. *Id*. at 284. Within ten minutes of discovering Anderson, Sousa heard the sirens of an ambulance, police car, and fire truck go by his apartment. Legge was astonished by the amount of blood on Anderson. She "got real concerned that maybe there was more to the story" than Anderson had told them. *Id*. at 319. Sousa inquired about Brooks's well-being and Anderson said that he did not know, "that she had a few blows to the face," but that he believed that "she was okay." *Id*. at 284. Anderson asked Sousa if he could sleep on his couch, and Sousa obliged. Sousa felt uneasy, so he did not go back to sleep.

[9] Around 11:00 that morning, Anderson asked Sousa to drive him somewhere. Sousa and another individual who had been asleep in Sousa's apartment, Patrick Florant, subsequently drove Anderson and dropped him off at a burger place. Before they left, Florant noticed blood on Anderson's pants. Anderson and Florant spoke a little bit, and Anderson told Florant not to call police.

Anderson was behaving "[a] little sketchy" in the car and "was laying down like he didn't want to be seen." *Id.* at 287. Florant wanted Anderson out of his car because of the "odd" way he was acting. *Id.* at 301. Florant was afraid of the "repercussions" because of whatever was "going on" with Anderson. *Id.*

[10] An autopsy of Brooks's body was performed by forensic pathologist Dr. Joseph Prahlow. Dr. Prahlow found multiple external injures to the body including "at least a couple dozen" blunt force injuries, several sharp force injuries, as well as additional injuries suggesting the possibility of strangulation. An internal examination also revealed that Brooks endured significant brain trauma as well as bleeding around the brain. The examination also revealed thermal injuries caused by smoke and soot inhalation. Regarding the sharp force injuries, Brooks had some "superficial or shallow" stab wounds and "three definite stab wounds." *Id.* at 384. One of the stab wounds went through the left side of her neck, cut her epiglottis, broke through a bone in her neck, and exited the right side of her neck. Another stab wound was seven inches in length, stretching from her left elbow to her shoulder, and cut through muscles and soft tissue in her arm. While all of the stab wounds would have caused significant bleeding, Dr. Prahlow opined that none of them "would be considered rapidly lethal." *Id.* at 387. Similarly, the blunt force head injuries "were not instantaneously lethal." *Id.* at 388. The evidence of the thermal injuries caused by smoke and soot inhalation indicated that Brooks was still breathing during the fire and that although all of her other injuries "did not kill her by themselves, [] they certainly could have." *Id.* at 388. Dr. Prahlow opined that the cause of

Brooks's death was "a combination of blunt force, sharp force, possible strangulation, thermal and smoke and soot inhalation." *Id*. at 393.

[11] Various items of evidence were collected from the crime scene which revealed the presence of Anderson's DNA. His DNA was found on a red stain on the latch of the back gate in the yard, and a white shirt found on Brooks's bed had numerous reddish-brown stains that contained both Anderson's and Brooks's DNA. A knife was also found in the home that had reddish-brown staining. DNA testing revealed Anderson's DNA on the knife handle and Brooks's DNA on the blade.

[12] The State charged Anderson with two counts of class B felony arson and one count of murder. A four-day jury trial began on December 14, 2009. Anderson testified at trial. He claimed that, after he and Brooks went to bed, three men entered Brooks's bedroom and attacked them. He said that one of the men had a gun. The man with the gun set fire to one of the sheets on the bed. Anderson stated that he saw the men stab Brooks. He claimed that he fought with the men, and maybe even killed one of them, before he was eventually able to escape. He stated that he heard Brooks screaming as he ran away. In response to the prosecutor's question on cross-examination, Anderson admitted that he had never told law enforcement this version of events prior to trial. The jury found Anderson not guilty of arson but guilty of murder. A sentencing hearing was held on February 12, 2010. The trial court sentenced Anderson to fifty-five years executed in the Department of Correction. This appeal ensued.

# Discussion and Decision

## Section 1 – Anderson has failed to establish fundamental error.

[13] Anderson first claims that the State violated his rights under the Fifth Amendment to the United States Constitution when, during cross-examination and closing argument, the prosecutor commented on his "post-detention silence." Appellant's Br. at 10. Anderson points to the following questions asked of him during the State's cross-examination:

Q: And with respect to the final count in this case, murder, you agree that Dawn Brooks was a living breathing human being before April 21?

A: Yes, she was, sir.

Q: That she was killed at the hands of another human being?

A: Yes, sir.

Q: And that wasn't some sort of weird accident?

A: No.

Q: Somebody attacked her?

A: Yes.

Q: Again, you're just saying that wasn't you?

A: Yes, it wasn't me, sir.

Q: You're saying it was these three guys that you have a

description about now today?

A: Yes, sir.

Q: That you assume pretty strongly was an ex-boyfriend?

A: It seemed like it. I'm not going to say it was. Didn't nobody tell me. It seemed like it.

Q: And so because you loved Dawn, certainly you would want the correct person in this case discovered and arrested, right?

A: Of course.

Q: So you wait until the morning of trial testimony to give information about the suspects to law enforcement?

A: I was advised by my lawyers not to say nothing.

Tr. at 693-95.

[14] Anderson also points to the following excerpt from the State's closing argument:

Mr. Anderson testified that he loved Dawn. Loved her. Was his girlfriend. He felt like less of man because he couldn't buy her pretty things on her birthday. He could have been a hero. He just defended his woman with honor by throwing a guy into a corner of that cabinet thing. Instead, a guy who doesn't feel like a man because he can't buy her a thing, runs away for hours and hours and hours, knowing that she's still alive in a burning house without saying a flipping thing to anybody? Are you kidding me?

Speaking of not saying a thing to anybody, he told you he didn't tell anybody this story before. He told some of the folks at

Indiana, although what they said he told them was not what you heard today. He didn't tell the police back then. He didn't tell the fire guys when they're swarming all over the neighborhood and at Dawn's house. In fact, he didn't tell anybody that could do anything about it until he came and sat on the stand in trial. He claims to have information about the attackers, information not just about their physical descriptions, but his assumptions about who they might be. He doesn't offer that to anybody so that anybody could be followed up on, so that people could be questioned about Dawn's ex-boyfriend[s] or acquaintances or anything like that.

He doesn't say, hey, I think I might even killed a guy. He bashed his head, and he was bleeding, and all the stuff you scraped up, check some of that to see if it is his blood. Anything that could have been verified, or stated differently, anything that could have been positively disproved. What did he do? He waited until he sat here. This from a man who claims to be in love with Dawn. This from a man who claims to be a human being trying to do the right thing and just too flustered to do it.

*Id*. at 725-26.

[15] Although not specifically framed us such, we discern that Anderson is claiming that the prosecutor committed misconduct in the form of what is referred to as a *Doyle* violation. In *Doyle v. Ohio,* 426 U.S. 610, 619 (1976), the United States Supreme Court held that using a defendant's post-arrest, post-*Miranda* silence to impeach an exculpatory story told for the first time at trial violated the defendant's due process rights. "*Doyle* rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Barton v. State,* 936 N.E.2d 842, 850 (Ind. Ct. App. 2010), *trans. denied* (2011).

"The key to *Doyle* is that it protects the defendant from being found guilty simply on the basis of a legitimate choice to remain silent." *Trice v. State,* 766 N.E.2d 1180, 1183-84 (Ind. 2002).[1] While Anderson frames the issue as a violation of his Fifth Amendment privilege against self-incrimination, a *Doyle* violation is actually a violation of the Fourteenth Amendment's Due Process Clause prohibition against fundamental unfairness. *Sobolewski v. State*, 889 N.E.2d 849, 856 (Ind. Ct. App. 2008), *trans. denied*.

[16] Because Anderson's trial counsel failed to object to the prosecutor's questions or comments, request a jury admonishment, or move for a mistrial, Anderson maintains that the prosecutor's conduct constituted fundamental error.[2] We review a claim of prosecutorial misconduct by determining (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise. *Ryan v. State,* 9 N.E.3d 663, 667 (Ind. 2014) (citation and quotation marks omitted). Where, as here, a

---

[1] We note that "[w]here a defendant asserts a *Doyle* violation, he 'ordinarily bears the burden of showing that *Miranda* warnings were given prior to the post-arrest silence used by the state for impeachment purposes.'" *Lainhart v. State*, 916 N.E.2d 924, 936 (Ind. Ct. App. 2009) (quoting 3 WAYNE R. LAFAVE, *Criminal Procedure* § 9.6(a) n.47 (3d ed. 2007)). Although the State contends that Anderson has not met that burden, we think that the record belies any assertion that Anderson was not *Mirandized* at some point prior to trial. He was arrested and detained in the St. Joseph County Jail pending trial, so we will presume that he received the standard advisement of his constitutional rights at the time of his arrest and booking. Also, Anderson's statement on the witness stand that "I was advised by my lawyers not to say nothing" indicates that he was aware that he had a legitimate choice to remain silent. Tr. at 695.

[2] "To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occur—request an admonishment to the jury, and if further relief is desired, move for a mistrial." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014).

defendant fails to properly preserve his claim, he must establish both that the grounds for prosecutorial misconduct are present and that the prosecutorial misconduct constituted fundamental error. *Id.*

[17] "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to 'make a fair trial impossible.'" *Id.* at 668 (quoting *Benson v. State,* 762 N.E.2d 748, 756 (Ind. 2002)). Indeed, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not sua sponte raising the issue because the alleged errors constituted clearly blatant violations of basic and elementary principles of due process and presented an undeniable and substantial potential for harm. *Id.* "An alleged *Doyle* violation is of constitutional magnitude and may be reviewed under the fundamental error doctrine." *Sobolewski*, 889 N.E.2d at 857.

[18] First, our review of some of the closing argument reveals that, for the most part, the prosecutor was referring not to Anderson's post-*Miranda* silence but to his pre-arrest failure to mention his version of events regarding the three attackers to the multiple witnesses, firemen, and law enforcement personnel whom he encountered shortly after he and Brooks were allegedly attacked, but before he was arrested. Therefore, *Doyle* was not implicated, as a prosecutor's comment on a defendant's pre-arrest, pre-*Miranda* silence is not prohibited. *Jenkins v. Anderson*, 447 U.S.231, 240 (1980) (impeachment by use of pre-arrest silence does not violate the Fourteenth Amendment).

[19]     As far as the challenged cross-examination questions and the remainder of the closing argument, we conclude that even assuming that the prosecutor's comments are deemed a *Doyle* violation, any such violation did not amount to fundamental error. To determine whether a *Doyle* violation denied a defendant a fair trial, we must examine five factors: (1) the use to which the prosecution puts the post-*Miranda* silence; (2) who elected to pursue the line of questioning; (3) the quantum of other evidence indicative of guilt; (4) the intensity and frequency of the reference; and (5) the availability to the trial court judge of an opportunity to grant a motion for mistrial or to give curative instructions. *Barton,* 936 N.E.2d at 852-53.

[20]     Regarding the first two factors, the State elected to briefly refer to Anderson's post-*Miranda* silence to impeach his novel claim at trial that he and Brooks were attacked by three men and that those men were responsible for the murder. As to the quantum of other evidence indicative of Anderson's guilt, the jury heard extensive circumstantial evidence, as well as DNA evidence found on one of the murder weapons, which clearly implicated Anderson in the murder. As to the intensity and frequency of the prosecutor's reference to Anderson's post-arrest silence, it was brief and did not comprise a substantial part of the State's case against Anderson. The State's cross-examination of Anderson comprises forty-four pages of the record, only two of which involve the prosecutor's questions regarding Anderson's post-arrest silence. Moreover, during closing argument, the prosecutor concentrated primarily on the ample circumstantial evidence of Anderson's guilt and did not emphasize his post-*Miranda* silence.

Finally, regarding the trial court's opportunity to give a curative instruction or grant a mistrial, Anderson failed to bring any concerns to the attention of the court, and we do not believe that Anderson has demonstrated that the trial court should have sua sponte recognized an undeniable or substantial potential for harm, as there was none. Under the circumstances presented, we cannot say that the State's minimal reference to Anderson's post-*Miranda* silence made a fair trial impossible. Consequently, we conclude that even if prosecutorial misconduct in the form of a *Doyle* violation occurred, it did not amount to fundamental error.

## Section 2 – The trial court did not abuse its discretion during sentencing.

[21] Anderson next asserts that the trial court abused its discretion during sentencing.[3] Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances. *Id*. A trial court abuses its discretion during sentencing by: (1) failing to enter a sentencing statement, (2) entering a sentencing statement that explains reasons for imposing sentence but the record does not support the reasons, (3) entering a sentencing statement that omits

---

[3] Although Anderson mentions this Court's sentence revision powers pursuant to Indiana Appellate Rule 7(B), he offers no 7(B) analysis or argument. Accordingly, we do not address it.

reasons that are clearly supported by the record and advanced for consideration, or (4) considering reasons that are improper as a matter of law. *Kimbrough v. State*, 979 N.E.2d 625, 628 (Ind. 2012).

[22] The trial court here found one aggravating factor and one mitigating factor, and imposed the advisory sentence of fifty-five years for the murder. Anderson contends that the trial court abused its discretion in finding the manner in which the murder was committed as an aggravating factor. It is well settled that the nature and circumstances of a crime may properly be considered as an aggravator. *Anglemyer*, 868 N.E.2d at 492; *McCann v. State*, 749 N.E.2d 1116, 1120 (Ind. 2001). Nevertheless, Anderson takes issue with the trial court's brief reference during sentencing to him setting fire to the house after he attacked Brooks. Anderson claims that this reference indicates that the court improperly relied upon arson, a crime of which he was acquitted, as the reason for finding the nature and circumstances of the crime as an aggravating factor. We disagree.

[23] The trial court's sentencing statement makes clear that the trial court considered the forensic pathology testimony, which detailed the extreme violence and torture inflicted upon Brooks by Anderson with a knife, as well as blunt force trauma and possible strangulation, all while Brooks remained alive and breathing. The court emphasized the suffering endured by Brooks and the fact that Anderson knew that she was still alive and admittedly had the opportunity to get her help, but that he chose to run and explicitly instructed others not to call the police or summon help. The court's reference to Anderson setting the

fire was by no means the linchpin of its otherwise proper consideration of the nature and circumstances of the crime as an aggravator, and thus we find no abuse of discretion.

[24] Affirmed.

Najam, J., and Robb, J., concur.